**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 18, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARY BISHOP and SHARON
BALDWIN,

      Plaintiffs - Appellees,

and

SUSAN G. BARTON and GAY E.
PHILLIPS,

      Plaintiffs - Appellees/
      Cross-Appellants,

v.

SALLY HOWE SMITH, in her official
capacity as Court Clerk for Tulsa County,
State of Oklahoma,

      Defendant - Appellant/
      Cross-Appellee,

UNITED STATES OF AMERICA, ex rel.
Eric H. Holder, Jr., in his official capacity
as Attorney General of the United States
of America,

      Defendant,

and

BIPARTISAN LEGAL ADVISORY
GROUP OF THE U.S. HOUSE OF
REPRESENTATIVES; THAD
BALKMAN; OKLAHOMAN'S FOR
PROTECTION OF MARRIAGE,

Nos. 14-5003 & 14-5006

Intervenors - Defendants.

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:04-CV-00848-TCK-TLW)**

---

James A. Campbell, Alliance Defending Freedom, Scottsdale, Arizona (Byron J. Babione and David Austin R. Nimocks, Alliance Defending Freedom, Scottsdale, Arizona, and John David Luton, Assistant District Attorney, District Attorney's Office, Tulsa, Oklahoma, with him on the briefs), for Defendant–Appellant/Cross-Appellee.

Don G. Holladay, Holladay & Chilton PLLC, Oklahoma City, Oklahoma (James E. Warner III, Holladay & Chilton PLLC, Oklahoma City, Oklahoma, and Joseph T. Thai, Norman, Oklahoma, with him on the briefs), for Plaintiffs–Appellees/Cross-Appellants.[*]

---

Before **KELLY**, **LUCERO**, and **HOLMES**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This appeal was brought by the Court Clerk for Tulsa County, Oklahoma, asking us to overturn a decision by the district court declaring unenforceable the Oklahoma state constitutional prohibition on issuing marriage licenses to same-sex couples. It followed quickly on the heels of an analogous appeal brought by State of Utah officials requesting similar relief. Recognizing that the ruling in the Utah case would likely control the disposition of her appeal, the Oklahoma appellant asked that we assign these cases to the same panel. Our court did so.

---

[*] The names of all amicus curiae parties are contained in Appendix A to this Opinion.

Preliminary to reaching the merits, we are presented with two arguments challenging the plaintiffs' standing. The first challenges whether plaintiffs may attack state constitutional provisions without simultaneously attacking state statutes to the same effect. The second challenges whether the Court Clerk is a proper defendant as to the non-recognition portion of the Oklahoma constitutional prohibition.

We hold that plaintiffs possess standing to directly attack the constitutionality under the United States Constitution of Oklahoma's same-sex marriage ban even though their claim does not reach Oklahoma's statutory prohibitions on such marriages. Under Oklahoma law, a constitutional amendment "takes the place of all the former laws existing upon the subject with which it deals." Fent v. Henry, 257 P.3d 984, 992 n.20 (Okla. 2011) (per curiam) (quotation omitted). Because the statutory prohibitions are subsumed in the challenged constitutional provision, an injunction against the latter's enforcement will redress the claimed injury.

An earlier appeal of this same case involving the standing inquiry led to a decision by a panel of our court that dismissed proceedings brought against the Governor and Attorney General of Oklahoma. That panel ruled that "recognition of marriages is within the administration of the judiciary." Bishop v. Okla. ex rel. Edmondson, 333 F. App'x 361, 365 (10th Cir. 2009) (unpublished) ("Bishop I"). We conclude that the law of the case doctrine applies to Bishop I, but that the doctrine is overcome by new evidence demonstrating that the Tulsa County Court Clerk could not redress the non-recognition injury, thereby depriving Gay Phillips and Susan Barton (the "Barton couple") of standing to sue.

-3-

Our merits disposition is governed by our ruling in <u>Kitchen v. Herbert</u>, No 13-4178, 2014 U.S. App. LEXIS 11935 (10th Cir. June 25, 2014). In that companion case, we held that: (1) plaintiffs who wish to marry a partner of the same sex or have such marriages recognized seek to exercise a fundamental right; and (2) state justifications for banning same-sex marriage that turn on the procreative potential of opposite-sex couples do not satisfy the narrow tailoring test applicable to laws that impinge upon fundamental liberties. Exercising jurisdiction under 28 U.S.C. § 1291, and governed by our ruling in <u>Kitchen</u>, we affirm.

## I

Mary Bishop and Sharon Baldwin are in a long-term committed relationship and seek to marry. They live together in Tulsa County, Oklahoma, where they both work for the <u>Tulsa World</u> newspaper. Bishop is a sixth-generation Oklahoman and Baldwin is "at least a fourth-generation Oklahoman." They jointly own their home and other property.

In March 2000, the couple exchanged vows in a church-recognized "commitment ceremony." They feel, however, that this ceremony fails to "signify the equality" of their relationship, and that marriage conveys a "level of commitment or respect" that is not otherwise available. Bishop and Baldwin sought a marriage license from the Tulsa County Court Clerk in February 2009, but were denied because they are both women. The couple identifies several discrete harms they have suffered because of their inability to marry, including $1,300 in legal fees to prepare a power of attorney form and health-care proxies. Moreover, they explain that their inability to marry under Oklahoma law is "demeaning" and "signals to others that they should not respect our relationship."

Phillips and Barton have been in a committed relationship since 1984. They took part in a civil union ceremony in Vermont in 2001, were married in Canada in 2005, and wed again in California in 2008. The couple jointly owns a company that provides training and assistance to non-profit agencies that conduct youth out-of-home care. Barton also teaches classes at Tulsa Community College, including a course titled "Building Relationships."

Phillips and Barton have suffered adverse federal tax consequences as a result of the Defense of Marriage Act ("DOMA"), as well as adverse state tax consequences stemming from Oklahoma's refusal to recognize their marital status. They say that having their relationship recognized as a marriage "should have been a dream come true." Instead, "the State of Oklahoma has said ours is not a real marriage, but something inferior to the relationships of married opposite sex couples."

In November 2004, plaintiffs Bishop, Baldwin, Barton, and Phillips filed suit against the Oklahoma Governor and Attorney General, challenging Oklahoma's state constitutional ban on same-sex marriage. The Oklahoma prohibition, known as State Question 711 ("SQ 711"), provides:

> A. Marriage in this state shall consist only of the union of one man and one woman. Neither this Constitution nor any other provision of law shall be construed to require that marital status or the legal incidents thereof be conferred upon unmarried couples or groups.
>
> B. A marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage.
>
> C. Any person knowingly issuing a marriage license in violation of this section shall be guilty of a misdemeanor.

Okla. Const. art. 2, § 35. The suit also named the United States President and Attorney General as defendants in a constitutional challenge to DOMA.

A motion to dismiss filed by the Governor and State Attorney General was denied by the district court in 2006. That decision was appealed to this court. In 2009, a panel of our court concluded that "[b]ecause the plaintiffs failed to name a defendant having a causal connection to their alleged injury that is redressable by a favorable court decision, . . . the Couples do not have standing." Bishop I, 333 F. App'x at 364. The panel held that "recognition of marriages is within the administration of the judiciary," and thus "the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage." Id. at 365.

On remand, the district court permitted the plaintiffs to file an amended complaint naming as a defendant the "State of Oklahoma, ex rel. Sally Howe-Smith, in her official capacity as Court Clerk for Tulsa County." The court granted Oklahoma's motion to dismiss the state as a nominal party, leaving Smith as the sole state defendant. The amended complaint also asserted challenges to §§ 2 and 3 of DOMA against the United States ex rel. Eric Holder. However, in February 2011, the United States notified the district court that it would no longer defend § 3 of DOMA on the merits. The Bipartisan Legal Advisory Group was permitted to intervene to defend the law. The case then progressed to the summary-judgment stage. Smith submitted an affidavit describing her duties as they related to the plaintiffs' allegations. In that affidavit, Smith swore that she had "no authority to recognize or record a marriage license issued by another state in any

setting, regardless of whether the license was issued to an opposite-sex or a same-sex couple."

After the Supreme Court issued its decision in United States v. Windsor, 133 S. Ct. 2675 (2013), the district court entered an opinion and order disposing of the United States' motion to dismiss, as well as Oklahoma and plaintiffs' cross-motions for summary judgment. See Bishop v. United States ex rel. Holder, 962 F. Supp. 2d 1252, 1263 (N.D. Okla. 2014) ("Bishop II"). The district court concluded that: (1) Phillips and Barton lacked standing to challenge § 2 of DOMA because state law, rather than that provision, resulted in non-recognition of their marriage, id. at 1263-68; (2) any challenge to § 3 of DOMA was moot in light of the Windsor decision, id. at 1269-72; (3) Phillips and Barton lacked standing to challenge the non-recognition portion of the Oklahoma amendment, Part B, because Smith is not involved in the recognition of out-of-state marriages, as established by her summary-judgment affidavit, id. at 1272-73; and (4) Part A of SQ 711 violates the Equal Protection Clause, id. at 1281-96. The court permanently enjoined enforcement of Part A. Id. at 1296. The decision, however, was stayed pending final disposition of any appeal. Id.

Smith timely appealed the district court's merits ruling as to Part A. Phillips and Barton cross-appealed the district court's conclusion that they lack standing to challenge Part B. The DOMA challenges are not at issue in this appeal.

## II

### A

Smith contends that Bishop and Baldwin (the "Bishop couple") lack standing to challenge Part A of SQ 711 because they did not simultaneously contest the constitutionality of a state statute that bars same-sex couples from marrying. We review a district court's standing determinations de novo. See Cressman v. Thompson, 719 F.3d 1139, 1144 (10th Cir. 2013). To establish standing, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000). Although the Bishop couple's standing was not raised below, a party may "raise the issue of standing for the first time at any stage of the litigation, including on appeal." New Eng. Health Care Emps. Pension Fund v. Woodruff, 512 F.3d 1283, 1288 (10th Cir. 2008).

The Bishop couple has not established redressability, Smith argues, because a second, unchallenged legal obstacle bars their marriage. Under Okla. Stat. tit. 43, § 3(a), which was not properly put at issue below, "[a]ny unmarried person who is at least eighteen (18) years of age and not otherwise disqualified is capable of contracting and consenting to marriage with a person of the opposite sex." Id. Although the district court enjoined enforcement of Part A, it did not enjoin operation of the statute. See Bishop II, 962 F. Supp. 2d at 1296. Because the statute permits marriage only between members of

-8-

the opposite sex, Smith argues that the Bishop couple's injury—their inability to marry—will not be redressed by an injunction against SQ 711 alone.[1] "[R]edressability is satisfied when a favorable decision relieves an injury," but a decision does not need to relieve "every injury." Consumer Data Indus. Ass'n v. King, 678 F.3d 898, 905 (10th Cir. 2012) (emphasis omitted).

In support, Smith asserts that several courts have concluded that plaintiffs lack standing under circumstances somewhat similar to the present matter. In White v. United States, 601 F.3d 545 (6th Cir. 2010), a group of plaintiffs challenged the federal Animal Welfare Act ("AWA"), which restricted "various activities associated with animal fighting that involve interstate travel and commerce, but did not (and does not) itself prohibit animal fighting, including cockfighting." Id. at 549. All fifty states, however, have prohibited cockfighting under state law. Id. The plaintiffs claimed that they had suffered economic injuries as a result of the federal statute's ban, including a decreased

---

[1] Smith also argues that the Barton couple does not have standing to contest Part B of SQ 711 because they did not challenge Okla. Stat. tit. 43, § 3.1, which provides that "[a] marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage." We will refer above only to Part A in discussing plaintiffs' failure to challenge the statutory codifications of Oklahoma's same-sex marriage policy as it relates to standing. As explained infra, the Barton couple lacked standing to sue because they named a defendant who could not redress their injury. Therefore, there is no need to consider whether they lacked standing for the alternative reason that they failed to challenge the statutory non-recognition provision. See Niemi v. Lasshofer, 728 F.3d 1252, 1260 (10th Cir. 2013) (noting that where there are multiple threshold issues that can be resolved without engaging in the merits a court has "'leeway to choose among' them and to 'take[] the less burdensome course'" (alteration in original) (quoting Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431, 436 (2007)).

market for fighting birds.  Id. at 549-50.  The Court concluded that these allegations did not support standing:

> Cockfighting is banned to a greater or lesser degree in all fifty states and the District of Columbia.  Thus, while economic injuries may constitute an injury-in-fact for the purposes of Article III standing, the plaintiffs' alleged economic injuries due to restrictions on cockfighting are not traceable only to the AWA.  Nor would these injuries be redressed by the relief plaintiffs seek, since the states' prohibitions on cockfighting would remain in place notwithstanding any action we might take in regard to the AWA.

Id. at 552 (citations omitted).

We are referred to numerous sign ordinance cases holding that "a plaintiff whose sign permit applications were denied on the basis of one provision in a county's sign ordinance, but which could have been denied on the basis of some alternate, but unchallenged regulation, does not have a redressable injury."  Maverick Media Grp., Inc. v. Hillsborough Cnty., 528 F.3d 817, 820 (11th Cir. 2008) (collecting cases).  In Maverick, for example, the court ruled that a court order barring enforcement of a county's ban on billboards would not aid the plaintiff because the signs it sought to build were also prohibited by unchallenged height and size limitations.  Id. at 821, 823.

We need not decide whether the cases cited by Smith are consistent with our circuit precedent because they are readily distinguishable from the case at hand.  Courts have concluded that plaintiffs fail to establish redressability only when an unchallenged legal obstacle is enforceable separately and distinctly from the challenged provision.  In White, the federal statute meaningfully differed from the state cockfighting prohibitions and was enforced by a different sovereign.  See 601 F.3d at 549.  Similarly, the sign cases

-10-

rest on the existence of an "alternate" regulation addressing a distinct issue. See

Maverick, 528 F.3d at 820.

Unlike the statutes and regulations at issue in the cases upon which Smith relies,

Okla. Stat. tit. 43, § 3(a) is not enforceable independent of SQ 711. Under Oklahoma

law:

> A time-honored rule teaches that a revising statute (or, as in this case, a
> constitutional amendment) takes the place of all the former laws existing
> upon the subject with which it deals. This is true even though it contains no
> express words to that effect. In the strictest sense this process is not repeal
> by implication. Rather, it rests upon the principle that when it is apparent
> from the framework of the revision that whatever is embraced in the new
> law shall control and whatever is excluded is discarded, decisive evidence
> exists of an intention to prescribe the latest provisions as the only ones on
> that subject which shall be obligatory.

Fent, 257 P.3d at 992 n.20 (quoting Hendrick v. Walters, 865 P.2d 1232, 1240 (Okla.

1993)). This rule suggests that SQ 711 "takes the place of" § 3(a), and only the

provisions of the constitutional amendment "shall be obligatory." Fent, 257 P.3d at 992

n.20.

Fent, Smith informs us, stands for the opposite proposition because another

portion of the opinion notes the general rules that "repeals by implication are never

favored," that "it is not presumed that the legislature, in the enactment of a subsequent

statute intended to repeal an earlier one, unless it has done so in express terms," and that

"all provisions must be given effect unless irreconcilable conflicts exist." Id. at 991. But

the quoted passage clarifies that when a constitutional amendment addresses the same

subject as a statute, replacement is "not repeal by implication" and occurs even absent

"express words." Id. at 992 n.20.

Fent did not involve a constitutional amendment replacing a statute; the court simply noted the rule in a footnote. The relevant quotation originates in Hendrick, which held that a constitutional amendment providing for a new oath of office for certain state positions superseded an existing statute prescribing a different oath. 865 P.2d at 1240-41. Smith is correct that the provisions at issue in Hendrick were arguably in conflict and the court found an "intent to abrogate." Id. at 1240 n.41. However, the broad language used in Hendrick and quoted in Fent directs that if the "framework" of a constitutional amendment indicates "that whatever is embraced in the new law shall control and whatever is excluded is discarded," courts should treat this framework as "decisive evidence" that the amendment is the only provision "on that subject which shall be obligatory." Fent, 257 P.3d at 992 n.20 (quoting Hendrick, 865 P.2d at 1240).

SQ 711 evinces such a framework. The Oklahoma Supreme Court cited Lankford v. Menefee, 145 P. 375 (Okla. 1914), in support of its conclusion in Hendrick. See 865 P.2d at 1240 nn.38-40. Lankford provides that "a subsequent statute revising the subject-matter of the former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must operate to repeal the former" as long as "it is apparent that the Legislature designed a complete scheme for the matter." 145 P. at 376. It follows that SQ 711 provides a complete scheme for Oklahoma's policy regarding same-sex marriage.

The statute identified by Smith has no effect beyond the restrictions on same-sex marriage imposed by SQ 711 because the two provisions are materially identical. Total eclipse of the function of the statute underscores our conclusion that the amendment

-12-

provides a complete scheme. Further, it raises the concern that the statute could not be enforced without violating the district court's injunction. Smith was enjoined from enforcing "Part A against same-sex couples seeking a marriage license." Bishop II, 962 F. Supp. 2d at 1296. If Smith were to deny the Bishop couple a marriage license because they are both women, she would simultaneously be enforcing both Okla. Stat. tit. 43, § 3(a) and Part A of SQ 711. There is no scenario in which Smith could enforce the statute but not enforce the amendment.[2]

Because the prohibition on same-sex marriage contained in Okla. Stat. tit. 43, § 3(a) is not enforceable independently of SQ 711, we conclude that the Bishop couple has shown that their injury is redressable in this suit.[3]

_____

[2] If the court relies on the subjective motivations of lawmakers to determine the constitutionality of Oklahoma's two provisions, Smith suggests that one might survive even if the other falls. However, as explained in Kitchen, 2014 U.S. App. LEXIS 11935, at *97, we conclude that because state laws prohibiting same-sex marriage impinge upon a fundamental right without satisfying the strict scrutiny test, such provisions fail regardless of subjective intent.

[3] The remaining prongs of standing as to the Bishop couple's ability to challenge Part A are not contested. We conclude nonetheless the couple has satisfied those prongs. See Alvarado v. KOB-TV, L.L.C. (Channel 4 News), 493 F.3d 1210, 1214 n.1 (10th Cir. 2007) (this court has authority to consider standing issues sua sponte). Having ruled that an injunction barring enforcement of Part A of SQ 711 redresses the Bishop couple's injury—inability to marry—we have no trouble concluding that they satisfy the traceability requirement. See Cache Valley Elec. Co. v. Utah Dep't of Transp., 149 F.3d 1119, 1123 (10th Cir. 1998) (noting that in many cases, "redressability and traceability overlap as two sides of a causation coin" (quotation omitted)). The Bishop couple sought a marriage license from Smith's office, but were denied because they are both women. See Papasan v. Allain, 478 U.S. 265, 282 n.14 (1986) (a defendant "responsible for general supervision of the administration by local . . . officials" of a challenged provision is a proper defendant). And the Bishop couple has identified several negative financial consequences of that denial. See Singleton v. Wulff, 428 U.S. 106, 113 (1976) (financial harm caused by challenged provision constitutes injury in fact).

**B**

Our consideration of the merits of the Bishop couple's appeal is largely controlled by our decision in <u>Kitchen</u>. As explained more fully in that opinion, we conclude that: (1) the Supreme Court's summary dismissal in <u>Baker v. Nelson</u>, 409 U.S. 810 (1972) (per curiam), is not controlling, <u>Kitchen</u>, 2014 U.S. App. LEXIS 11935, at *21-31; (2) plaintiffs seek to exercise the fundamental right to marry, <u>id.</u> at *33-63; and (3) state arguments that same-sex marriage bans are justified by the need to communicate a conceptual link between marriage and procreation, encourage parenting by mothers and fathers, and promote sacrifice by parents for their children fail to satisfy the narrow tailoring requirement of the applicable strict scrutiny test, <u>id.</u> at *63-87.

Facts and arguments presented in this case differ in some respects from those in <u>Kitchen</u>. But our core holdings are not affected by those differences. State bans on the licensing of same-sex marriage significantly burden the fundamental right to marry,[4] and arguments based on the procreative capacity of some opposite-sex couples do not meet the narrow tailoring prong. In addition to the issues explicitly discussed in <u>Kitchen</u>, we address two other arguments raised by Smith.

She contends that lower federal courts are not free to reject on-point summary dismissals of the Supreme Court regardless of doctrinal developments. Thus, Smith

---

[4] Although the district court declined to rule on whether the plaintiffs asserted a fundamental right, <u>Bishop II</u>, 962 F. Supp. 2d at 1285 n.33, and instead applied rational basis review, <u>id.</u> at 1295, we may "affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground," <u>Schanzenbach v. Town of Opal</u>, 706 F.3d 1269, 1272 (10th Cir. 2013) (quotation omitted). As in <u>Kitchen</u>, we do not address the question of whether a ban on same-sex marriage might survive lesser forms of scrutiny given our holding that such bans burden fundamental rights.

argues, Baker remains controlling.  Her focus is on the Court's statement that a summary disposition "is not here of the same precedential value as would be an opinion of this Court treating the question on the merits."  Tully v. Griffin, Inc., 429 U.S. 68, 74 (1976) (quotation omitted, emphasis added).  This statement, Smith contends, indicates that, although they may have diminished precedential value for the Supreme Court, summary dispositions are identical to merits decisions when considered by lower courts.  She also cites the Court's direction that summary dispositions "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions."  Mandel v. Bradley, 432 U.S. 173, 176 (1977).

Her argument that doctrinal developments do not allow a lower court to reject the continued applicability of a summary disposition is undermined by the explicit language of the case creating that rule.  In Hicks v. Miranda, 422 U.S. 332 (1975), the Court stated that "inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise."  Id. at 344 (quotation omitted, emphases added); see also Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 94 n.11 (1983) (noting circuit court's holding that a doctrinal development warranted departure from precedent set by Supreme Court's summary dispositions); Okla. Telecasters Ass'n v. Crisp, 699 F.2d 490, 495 (10th Cir. 1983) ("[A] summary disposition is binding on the lower federal courts, at least where substantially similar issues are presented, until doctrinal developments or direct decisions by the Supreme Court indicate otherwise." (emphases added)), rev'd sub nom. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691 (1984).  Thus, contrary to Smith's position, the

doctrinal developments statement is explicitly directed toward lower courts. And as explained in Kitchen, nearly every lower federal court to have considered the issue has concluded that Baker has been undermined by doctrinal developments. Kitchen, 2014 U.S. App. LEXIS 11935, at *25-26.

In addition to her Baker argument, Smith also contends that children have an interest in being raised by their biological parents. Assuming that serving this interest is a compelling governmental goal, we nevertheless conclude that a prohibition on same-sex marriage is not narrowly tailored to achieve that end. See Reno v. Flores, 507 U.S. 292, 301-02 (1993) (stating strict scrutiny test). Oklahoma has enacted numerous laws that result in children being raised by individuals other than their biological parents. See, e.g., Okla. Stat. tit. 10, § 554 ("Any child or children born as a result of a heterologous oocyte donation shall be considered for all legal intents and purposes, the same as a naturally conceived legitimate child of the husband and wife which consent to and receive an oocyte pursuant to the use of the technique of heterologous oocyte donation."); § 556(B)(1) ("Any child or children born as a result of a human embryo transfer donation shall be considered for all legal intents and purposes, the same as a naturally conceived legitimate child of the husband and wife that consent to and receive a human embryo transfer."); § 7501-1.2(A) ("The Legislature of this state believes that every child should be raised in a secure, loving home and finds that adoption is the best way to provide a permanent family for a child whose biological parents are not able or willing to provide for the child's care or whose parents believe the child's best interest will be best served through adoption."). And Oklahoma permits infertile opposite-sex couples to marry

-16-

despite the fact that they, as much as same-sex couples, might raise non-biological children.

The State thus overlooks the interests of children being raised by their biological parents in a wide variety of contexts. Yet Smith does not explain why same-sex marriage poses a unique threat such that it must be treated differently from these other circumstances. See Zablocki v. Redhail, 434 U.S. 374, 390 (1978) ("grossly underinclusive" statute did not satisfy narrow tailoring requirement). As the Court explained in Eisenstadt v. Baird, 405 U.S. 438 (1972), if "the evil, as perceived by the State, would be identical" with respect to two classes, the state may not impinge upon the exercise of a fundamental right as to only one class because "the underinclusion would be invidious." Id. at 454. As we explained in Kitchen, such divergence between the characteristic claimed to be relevant and the classification contained in the challenged provision is inconsistent with the narrow tailoring requirement. See Kitchen, 2014 U.S. App. LEXIS 11935, at *64-75.

Moreover, Oklahoma's ban on same-sex marriage sweeps too broadly in that it denies a fundamental right to all same-sex couples who seek to marry or to have their marriages recognized regardless of their child-rearing ambitions. As with opposite-sex couples, members of same-sex couples have a constitutional right to choose against procreation. See Eisenstadt, 405 U.S. at 453 ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (emphasis omitted)). But Oklahoma has barred all same-sex couples,

regardless of whether they will adopt, bear, or otherwise raise children, from the benefits of marriage while allowing all opposite-sex couples, regardless of their child-rearing decisions, to marry. Such a regime falls well short of establishing "the most exact connection between justification and classification." Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (quotation omitted); see also Frisby v. Schultz, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").

In summary, none of the arguments presented by Smith that were unaddressed in Kitchen persuade us to veer from our core holding that states may not, consistent with the United States Constitution, prohibit same-sex marriages.

### III

I am grateful to Judge Holmes for his authorship of this, Part III of the majority opinion. Judge Holmes was on panel for our earlier decision in Bishop I. His authorship of this section is acknowledged with thanks.

Because Smith lacks "authority to recognize any out-of-state marriage and therefore [lacks the] ability to redress the Barton couple's non-recognition injury," Bishop II, 962 F. Supp. 2d at 1273, the district court held that the Barton couple lacked standing to challenge Part B of SQ 711 as against Smith. We conclude that although the law of the case doctrine applied to Bishop I, Smith's affidavit constituted new evidence sufficient to overcome the doctrine. We further conclude that the Barton couple's argument that Part B is inseverable from Part A—and that both must therefore fall together—was forfeited.

-18-

**A**

"Under the 'law of the case' doctrine, when a court rules on an issue of law, the ruling 'should continue to govern the same issues in subsequent stages in the same case.'" United States v. Graham, 704 F.3d 1275, 1278 (10th Cir. 2013) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)) (quotation omitted). The doctrine pertains both to rulings by district courts, see, e.g., Clark v. State Farm Mut. Auto. Ins. Co., 590 F.3d 1134, 1140 (10th Cir. 2009), and—as relevant here—by previous panels in prior appeals in the same litigation, see, e.g., United States v. Wardell, 591 F.3d 1279, 1300 (10th Cir. 2009). Importantly, "[w]e have routinely recognized that the law of the case doctrine is 'discretionary, not mandatory,' and that the rule 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit on their power.'" Kennedy v. Lubar, 273 F.3d 1293, 1299 (10th Cir. 2001) (quoting Stifel, Nicolaus & Co. v. Woolsey & Co., 81 F.3d 1540, 1544 (10th Cir. 1996)) (quotation omitted); accord Haynes Trane Serv. Agency v. Am. Standard, Inc., 573 F.3d 947, 963 (10th Cir. 2009). Even so, it takes "exceptionally narrow circumstances" for the court not to follow the law of the case when the doctrine applies. United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998).

In Bishop I, a panel of this court found that neither the Barton couple nor the Bishop couple had standing to challenge SQ 711. 333 F. App'x at 365. It determined that the couples could not demonstrate redressability, reasoning as follows:

> The Couples claim they desire to be married but are prevented from doing so, or they are married but the marriage is not recognized in Oklahoma. These claims are simply not connected to the duties of the Attorney General

-19-

> or the Governor. Marriage licenses are issued, fees collected, and the licenses recorded by the district court clerks. [A] district court clerk is judicial personnel and is an arm of the court whose duties are ministerial, except for those discretionary duties provided by statute. In the performance of [a] clerk's ministerial functions, the court clerk is subject to the control of the Supreme Court and the supervisory control that it has passed down to the Administrative District Judge in the clerk's administrative district. Because recognition of marriages is within the administration of the judiciary, the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage.

Id. (alterations in original) (quotation and citations omitted). Taking this passage at face value, it is most logically construed as the panel's determination that the Barton couple should have sued a district court clerk on their non-recognition claim. The panel: (1) prefaced its discussion with a reference to both the ban and the non-recognition claims; (2) found standing on neither; (3) reasoned that the Attorney General and the Governor were improper defendants; (4) explained that judicial personnel were proper defendants; and (5) informed the plaintiffs that court clerks represented the judiciary and carried out many of the branch's duties relating to marriage. Collectively, these points lead to but one interpretation: the correct defendant for the Barton couple's non-recognition claim was a court clerk.

One possible counterargument is that when the panel wrote that "recognition of marriages" was "within the administration of the judiciary," id., it meant in the broader sense of recognizing a couple's right to get a marriage license in Oklahoma. That argument makes little sense when one considers the context: the first sentence of the paragraph describes the complaint of the couples (more specifically, the Barton couple) as alleging that "they are married but the marriage is not recognized in Oklahoma," id.

-20-

(emphasis added), and the order consistently uses some form of the word "recognize" to describe the Barton couple's claim, see id. at 362-63.

Another potential counterargument is that the panel determined only that the Barton couple should look for a defendant in the judicial branch, not that they should necessarily select a court clerk. See id. at 365 ("Because recognition of marriages is within the administration of the judiciary, the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage." (emphasis added)). Again, though, context belies this interpretation. Why mention the role of the court clerks in administering the marriage statutes, and why describe their relationship to the rest of the court system, if not to express the opinion that they are appropriate defendants?

That the panel concluded that a court clerk was the proper adversary for the Barton couple does not necessarily mean that this conclusion became the law of the case. There are three potential reasons to hold that it did not: (1) the conclusion was dicta; (2) the conclusion dealt with recognition of an older marriage entered into by the Barton couple, not their current marriage; and (3) as a jurisdictional determination, the conclusion was not subject to the law of the case doctrine. None of these reasons are persuasive.

Turning to the first, it is well-settled that "[d]icta is not subject to the law of the case doctrine." Homans v. City of Albuquerque, 366 F.3d 900, 904 n.5 (10th Cir. 2004); accord Octagon Res., Inc. v. Bonnett Res. Corp. (In re Meridian Reserve, Inc.), 87 F.3d 406, 410 (10th Cir. 1996). Statements which appear in an opinion but which are unnecessary for its disposition are dicta. See United States v. Manatau, 647 F.3d 1048,

-21-

1054 (10th Cir. 2011); United States v. Villarreal-Ortiz, 553 F.3d 1326, 1329 n.3 (10th Cir. 2009) (per curiam). One could argue that Bishop I held only that the Governor and the Attorney General were the wrong defendants, not that Smith was the right one. But it is not so easy to separate the two propositions as a logical matter, and the "law of the case applies to issues that are resolved implicitly." Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr., 94 F.3d 1407, 1410 (10th Cir. 1996). Bishop I's holding that the Governor and Attorney General were improper defendants was tethered closely to the panel's view of who the right defendant was. That is, the panel's rationale for finding no standing was that the Governor and Attorney General were not responsible for administering marriage laws and the court clerks were. See Bishop I, 333 F. App'x at 365 ("The Couples claim they desire to be married but are prevented from doing so, or they are married but the marriage is not recognized in Oklahoma. These claims are simply not connected to the duties of the Attorney General or the Governor. Marriage licenses are issued, fees collected, and the licenses recorded by the district court clerks."). Therefore, the panel held, if only implicitly, that the court clerk was the correct defendant to name for the Barton couple's non-recognition claim.

The second potential reason to rule that Bishop I created no law of the case on standing to sue on the non-recognition claim is that the panel never ruled on such a claim with reference to the Barton couple's California marriage, upon which the claim is now based; rather, it ruled only on their Canadian marriage and Vermont civil union, since the California marriage was solemnized after briefing in the appeal was complete. See id. at 363 (mentioning the events in Vermont and Canada but not the California marriage).

This is a distinction without a difference. The holding in Bishop I had nothing to do with what sovereign conferred the status that the Barton couple wished to have recognized; it had only to do with which state officials were responsible for offering or withholding that recognition. See id. at 365 (noting that "the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage").

Lastly, it is Smith's view that the law of the case doctrine is per se excluded from consideration on this point because the standing issue is jurisdictional. Smith's stance is squarely foreclosed by Supreme Court precedent. In Christianson v. Colt Industries Operating Corp., 486 U.S. 800 (1988), the Court took up a dispute in which the Seventh Circuit and the Federal Circuit had each disclaimed jurisdiction and had each transferred the case to the other. Id. at 803-04. The Supreme Court admonished the feuding circuit courts of the importance of "adhering strictly to principles of law of the case." Id. at 819. In so doing, the Supreme Court did not tailor its articulation of the law of the case doctrine to the jurisdictional context. Quite to the contrary, it explicitly declared that "[t]here is no reason to apply law-of-the-case principles less rigorously to transfer decisions that implicate the transferee's jurisdiction." Id. at 816 n.5. Christianson thus makes clear that the law of the case doctrine is never off the table solely because an issue is jurisdictional. The circuits have agreed that this rule applies to a situation, like the one present today, where a prior panel of the same court resolved a jurisdictional matter in an earlier appeal. See Alexander v. Jensen-Carter, 711 F.3d 905, 909 (8th Cir. 2013); Sierra Club v. Khanjee Holding (US) Inc., 655 F.3d 699, 704 (7th Cir. 2011); Free v. Abbott Labs., Inc., 164 F.3d 270, 272-73 (5th Cir. 1999); Ferreira v. Borja, 93 F.3d 671, 674 (9th

-23-

Cir. 1996) (per curiam); LaShawn A. v. Barry, 87 F.3d 1389, 1394 (D.C. Cir. 1996) (en banc); Oneida Indian Nation of N.Y. v. New York, 860 F.2d 1145, 1151 (2d Cir. 1988).[5]

For the proposition that the law of the case doctrine has no applicability to jurisdictional matters, Smith relies chiefly on Baca v. King, 92 F.3d 1031 (10th Cir. 1996). Baca cannot support that weight. In the crucial passage from that case, we stated that "[o]ne application of the 'law of the case' doctrine gives an appellate court discretion to refuse to reconsider an issue decided at an earlier stage of the litigation" and that doctrine "is not a fixed rule that prevents a federal court from determining the question of its own subject matter jurisdiction in a given case." Id. at 1035. Far from carving out an exception to customary law-of-the-case practices in the jurisdictional context, Baca was actually applying the classic law-of-the-case approach to a jurisdictional question. That is, the law of the case is never "a fixed rule," id., but rather always a "discretionary . . . practice of courts generally to refuse to reopen what has been decided." Kennedy, 273 F.3d at 1299 (quotation omitted). Utilizing that well-established framework, the Baca court determined that the law of the case did not dictate the result of the jurisdictional question presented under the circumstances in that dispute. Baca did not foreclose the

_____

[5] The law of the case doctrine is inapplicable when a merits panel considers a jurisdictional issue that was addressed by a motions or mandamus panel. See Kennedy, 273 F.3d at 1299-1300 (mandamus panel); Stifel, Nicolaus & Co., 81 F.3d at 1544 (motions panel). Bishop I, however, was a fully-reasoned decision by a merits panel. The motions-panel and mandamus-panel exceptions are therefore not germane here.

possibility that the law of the case might, in other controversies, control a jurisdictional issue.[6]

By emphasizing the jurisdictional nature of the issue, Baca reflected the longstanding rule that while there is no categorical exclusion from the law of the case doctrine for jurisdictional issues, a slightly more flexible methodology is called for in the jurisdictional context. In this regard, we have indicated that "[i]ssues such as subject matter jurisdiction . . . may be particularly suitable for reconsideration," even where the doctrine might otherwise counsel against it. Kennedy, 273 F.3d at 1299 (quotation and citation omitted). Our law on that point is consistent with respected secondary authority and with the pronouncements of our sister circuits. See Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 515 (4th Cir. 2003) ("Law of the case, which is itself a malleable doctrine meant to balance the interests of correctness and finality, can likewise be calibrated to reflect the increased priority placed on subject matter jurisdictional issues generally, and Article III standing in particular which represents perhaps the most important of all jurisdictional requirements." (emphasis added) (quotation omitted));

_____

[6] Though worded somewhat more confusingly than Baca, Smith's other central authority for this jurisdictional argument—Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc., 123 F.3d 111 (3d Cir. 1997)—is to the same effect. There, the Third Circuit cabined the pivotal footnote from Christianson to the transfer context, reasoning that the Supreme Court could not have "intended in one footnote to eviscerate, in all instances, the federal courts' prerogative to revisit important jurisdictional questions." Id. at 118. But the very reason the Magnesium Elektron court reevaluated the jurisdictional issue there was that new evidence "was presented to the district court which had a direct bearing on the issue of standing." Id. As explained at length below, new evidence of this sort is one of the established exceptions to the law of the case, United States v. Irving, 665 F.3d 1184, 1192 n.12 (10th Cir. 2011), and the new evidence in Magnesium Elektron was in fact the exact type of new evidence at issue in the present appeal. Magnesium Elektron is therefore consistent with the approach taken herein.

Shakman v. Dunne, 829 F.2d 1387, 1393 (7th Cir. 1987) ("[C]ourts are significantly less constrained by the law of the case doctrine with respect to jurisdictional questions." (emphasis added)); 18B Charles Alan Wright et al., Federal Practice and Procedure § 4478.5, at 790 (2d ed. 2002) (henceforth Federal Practice) (noting that "[t]he force of law-of-the-case doctrine is affected by the nature of the first ruling and by the nature of the issues involved" and then ranking subject-matter jurisdiction as one of the issues "most likely to be reconsidered because of [its] conceptual importance"); id. at 798-800 ("Although a federal court is always responsible for assuring itself that it is acting within the limits of subject-matter jurisdiction statutes and Article III, this duty need not extend to perpetual reconsideration. A court may accept its own earlier determination supporting subject-matter jurisdiction or justiciability; a denial of subject-matter jurisdiction or justiciability is easily adhered to. Reconsideration of these matters is particularly appropriate nonetheless . . . ." (emphases added) (footnotes omitted)).

In sum, the law of the case doctrine does apply to prior jurisdictional determinations by merits panels, but it applies in a somewhat weaker fashion such that the court can consider with special care whether an exception to the doctrine permits reassessment of jurisdiction. That more flexible form of the doctrine will be brought to bear in the following section.

**B**

Applying the law of the case doctrine with the foregoing considerations in mind, Bishop I does not require a finding of standing to sue on the non-recognition claim.

-26-

As a practice rather than a rigid rule, the law of the case is subject to three narrow exceptions: (1) when new evidence emerges; (2) when intervening law undermines the original decision; and (3) when the prior ruling was clearly erroneous and would, if followed, create a manifest injustice. See Irving, 665 F.3d at 1192 n.12; Clark, 590 F.3d at 1140.

Although Smith focuses on the third exception, the first provides a better framework for the analysis. This is so because Smith does not make a case for why invocation of law of the case would work "a manifest injustice," which the clearly-erroneous exception requires.[7] See, e.g., Zinna v. Congrove, ___ F.3d ___, 2014 U.S. App. LEXIS 10460, at *11 (10th Cir. 2014); Irving, 665 F.3d at 1192 n.12; Rimbert v. Eli Lilly & Co., 647 F.3d 1247, 1251 (10th Cir. 2011). Further, Smith is relying in her law-of-the-case argument on a document—her affidavit—that was not presented to the courts until after Bishop I's issuance. If the affidavit shows Smith to be an improper defendant, as she maintains, then the Bishop I panel could not have clearly erred in finding to the contrary, as it did not have the benefit of that affidavit. Substantively, then, the new-evidence exception is the more appropriate exception to consider here.

---

[7] Insofar as Smith is arguing, implicitly, that application of law of the case works a manifest injustice, that argument is unconvincing. If any party here can make a colorable claim of injustice, it is the Barton couple, who named as a defendant the official that the Bishop I panel told them to name and who find out today that they should have named someone else and, as a result, are denied the satisfaction of an explicit invalidation of Part B.

Having located the relevant exception, we confront two questions: (1) whether the affidavit qualifies as new evidence for purposes of the exception; and (2) whether the affidavit proves the absence of standing.  Both questions demand an affirmative answer.

**1**

Turning to the first question, there can be no serious argument that the affidavit is anything other than new evidence within the meaning of the exception.  Smith Machinery Co. v. Hesston Corp., 878 F.2d 1290 (10th Cir. 1989), is a helpful place to begin.  In that case, a district court at summary judgment reconsidered a previous ruling despite the law of the case, relying in part on the proposition that "the law of the case doctrine does not . . . apply in cases in which new evidence is presented to a court."  Id. at 1292.  We affirmed, noting that the district court had before it "depositions and affidavits presented by both parties" attesting to new and relevant facts.  Id. at 1293.  Tacitly, Smith Machinery endorsed the district court's use of the summary-judgment affidavits in its new-evidence analysis.

This implicit holding is in keeping with general principles of law.  As In re Antrobus, 563 F.3d 1092 (10th Cir. 2009) (per curiam), intimated, an affidavit is properly categorized as new evidence under the law of the case where it constitutes "admissible evidence," id. at 1099 n.3, and affidavits are plainly competent evidence at summary judgment, see Fed. R. Civ. P. 56(c)(1)(A) (providing that a party moving for summary judgment may support its motion by pointing to affidavits); Hansen v. PT Bank Negara

Indon. (Persero), 706 F.3d 1244, 1250 (10th Cir. 2013) ("[A]ffidavits are entirely proper on summary judgment . . . .").[8]

Nor is there any apparent reason why an affidavit at summary judgment would not be regarded as a proper piece of new evidence such that the exception is satisfied. That is presumably why the Fifth Circuit has accepted such affidavits as new evidence in evaluating whether the law of the case controls or not. See United States v. Horton, 622 F.2d 144, 148 (5th Cir. 1980) (per curiam) (finding that the law of the case did not preclude the entry of summary judgment despite an earlier contrary ruling "because the production of reports, admissions, affidavits, and other record material during the course of the proceedings had clarified and resolved questions of material fact on several of the [relevant] issues").

It is true that previously-available evidence often cannot be used to unsettle the law of the case. See In re Antrobus, 563 F.3d at 1099 ("The difficulty is that the Antrobuses have not demonstrated that they were unable to present evidence along these very same lines over a year ago, when this litigation began."); United States v. Monsisvais, 946 F.2d 114, 117 (10th Cir. 1991) ("The 'different or new evidence' exception does not apply because . . . the additional evidence provided by the government at the supplemental hearing was evidence it had in its possession, but failed to produce, at the time of the original hearing."). But neither Smith nor any other court clerk was a

---

[8] The new-evidence exception is often set forth with reference to new evidence at a new trial. See, e.g., Irving, 665 F.3d at 1192 n.12; Clark, 590 F.3d at 1140. As the authorities assembled in this section show, a new trial is not necessary for the production of new evidence—a summary-judgment affidavit can suffice.

party to the case at the time of Bishop I. Smith consequently did not have an opportunity to introduce the evidence earlier, and no party had any reason to seek it out. As demonstrated by the quotes recited above from Antrobus and Monsisvais, this previously-available-evidence bar is applied when the party seeking to circumvent the law of the case had a chance to introduce the evidence in the prior proceedings and failed to exploit that chance. See In re Antrobus, 563 F.3d at 1099 ("The difficulty is that the Antrobuses have not demonstrated that they were unable to present evidence along these very same lines over a year ago, when this litigation began." (emphases added)); Monsisvais, 946 F.2d at 117 ("The 'different or new evidence' exception does not apply because . . . the additional evidence provided by the government at the supplemental hearing was evidence it had in its possession, but failed to produce, at the time of the original hearing." (emphases added)). That is not the case here. Smith did not fail to do anything during Bishop I because she was not participating in Bishop I. Accordingly, this bar does not apply, and Smith's affidavit does qualify as new evidence within the meaning of the new-evidence exception to the law of the case doctrine.[9]

---

[9] Had Bishop I been published, its force as law of the case would have been significantly strengthened by its status as law of the circuit as well. See LaShawn A., 87 F.3d at 1395 ("[W]hen both [the law of the case and the law of the circuit] are at work, the law-of-the-circuit doctrine should increase a panel's reluctance to reconsider a decision made in an earlier appeal in the same case."). Because the order was unpublished, law-of-the-case principles are the only constraint here. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value. They may also be cited under the doctrines of law of the case, claim preclusion, and issue preclusion."); Federal Practice § 4478.2, at 731 ("If an unpublished opinion does not command precedential force under circuit rules, law-of-the-case rules hold full sway.").

The next question is whether the affidavit demonstrates a lack of standing. It does.

Article III standing is a prerequisite to every lawsuit in federal court. See Petrella v. Brownback, 697 F.3d 1285, 1292-93 (10th Cir. 2012); Jackson v. Volvo Trucks N. Am., Inc., 462 F.3d 1234, 1241 (10th Cir. 2006). "Each plaintiff must have standing to seek each form of relief in each claim." Bronson v. Swensen, 500 F.3d 1099, 1106 (10th Cir. 2007); accord Meyer v. Christie, 634 F.3d 1152, 1157 (10th Cir. 2011). In order to demonstrate "Article III standing, a plaintiff must show: (1) that [she] has suffered a concrete and particular injury in fact that is either actual or imminent; (2) the injury is fairly traceable to the alleged actions of the defendant; and (3) the injury will likely be redressed by a favorable decision." Kerr v. Hickenlooper, 744 F.3d 1156, 1163 (10th Cir. 2014); accord S. Utah Wilderness Alliance v. Palma, 707 F.3d 1143, 1153 (10th Cir. 2013). The issue at hand turns on the third requirement—that of redressability—which "is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." Bronson, 500 F.3d at 1111. As established by her affidavit, that is the case with Smith and Part B.

In the affidavit, Smith swore that she had "no authority to recognize or record a marriage license issued by another state in any setting, regardless of whether the license was issued to an opposite-sex or a same-sex couple." The plaintiffs have offered nothing of substance to contradict that statement.[10] With the new affidavit, the uncontroverted

---

[10] The plaintiffs assert that Smith's affidavit is contradicted by her answer to the complaint, wherein she "admit[ted] that Defendants, and those subject to their

summary-judgment record shows that Smith had no power to recognize the Barton

couple's out-of-state marriage, and therefore no power to redress their injury.[11]  Since

Smith was the only state defendant named in the operative complaint, the Barton couple

had no standing to sue on their non-recognition claim.  See Cressman, 719 F.3d at 1147

(finding that a plaintiff had no standing to sue a defendant because the plaintiff "provided

no basis to conclude that the district court could order [the defendant] to do anything in

her official capacity to redress [the plaintiff's] alleged injuries"); Nova Health Sys. v.

Gandy, 416 F.3d 1149, 1159 (10th Cir. 2005) (dismissing a claim in part for lack of

redressability where a favorable "judgment would likely do nothing to prevent [the

harm], and thus would not be substantially likely to redress [the plaintiff's] injury in

fact").

---

supervision, direction and control, are responsible for the enforcement of the laws
challenged by Plaintiffs' First Amended Complaint."  In rebuttal, Smith notes that the
challenged laws referenced in the answer did not include the non-recognition provision,
since the first amended complaint did not address that provision.  Smith has the better
argument.  The parties apparently came to terms on this point in the district court, where
a minute sheet reflected their consensus "that plaintiffs' motion for summary judgment
[would] address [the non-recognition provision], notwithstanding the absence of such
language in the Amended Complaint."  (Emphasis added).  Although the complaint
included some stray passages that appeared to attribute all of the plaintiffs' injuries to SQ
711 as a whole, it never explicitly mentioned the non-recognition provision and
repeatedly suggested that it was the ban, in conjunction with DOMA, that caused the non-
recognition injury.  Smith's "admission" in her answer is therefore irrelevant to this issue.

[11] The authorities cited by Bishop I for its standing determination either impose
responsibilities on court clerks with respect to issuing marriage licenses, see Okla. Stat.
tit. 28, § 31; id. tit. 43, § 5, or examine the general relationship between court clerks and
the judicial branch, see Speight v. Presley, 203 P.3d 173 (Okla. 2008).  None of the
authorities address the role court clerks play in regards to marriage recognition.

There are various potential counterarguments that resist this conclusion, but they all fail.

First, an argument could be made that the Barton couple was entitled to sue Smith as the face of the judiciary <u>despite</u> the undisputed fact that she has no personal involvement in recognizing foreign marriages. Granted, there are scenarios in which a plaintiff is permitted to seek relief against a defendant who would only be indirectly implicated in any harm suffered by the plaintiff. Notably, however, these scenarios frequently arise when a plaintiff fearing prosecution sues a state attorney general and other law enforcement officials to challenge a criminal statute. <u>See, e.g.</u>, <u>Doe v. Bolton</u>, 410 U.S. 179, 188-89 (1973); <u>Wilson v. Stocker</u>, 819 F.2d 943, 946-47 (10th Cir. 1987). An attorney general is the chief law enforcement officer of his or her jurisdiction. <u>See</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 520 (1985). As such, he or she is charged with enforcing all of the criminal statutes on the books. <u>See, e.g.</u>, <u>Gandy</u>, 416 F.3d at 1158. It is therefore logical to name that person in his or her representative capacity when one is concerned about a potential criminal prosecution. <u>See</u> <u>id.</u> ("[A]n official who is charged with enforcing a state statute on behalf of the entire state is a proper defendant, so long as the plaintiff shows an appreciable threat of injury flowing directly from the statute.").

It is less logical to sue a court clerk as the face of a non-recognition regime. Far from being delegated the responsibility to enforce that regime, the court clerk has a very tenuous relationship to the non-recognition provision. To be sure, Oklahoma courts <u>apply</u> the State's laws regarding the validity of marriages. <u>See</u> <u>Copeland v. Stone</u>, 842 P.2d 754, 755 (Okla. 1992) (deciding a case involving a prohibition on remarriage within

six months of divorce); Mueggenborg v. Walling, 836 P.2d 112, 112 (Okla. 1992) (deciding a case involving the existence vel non of a common-law marriage); Allen v. Allen (In re Estate of Allen), 738 P.2d 142, 143 (Okla. 1987) (deciding a case posing the question of whether a marriage had been properly dissolved for estate-distribution purposes); see also Oral Arg. at 15:08-29 (pointing out that Oklahoma's judicial branch makes the "ultimate determination" of marriage validity with respect to matters like divorce, child custody, inheritance, and bigamy). But all laws are applied by the courts, and all laws are ultimately given their binding meaning by the judiciary. See Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1571 n.9 (10th Cir. 1995) ("'[I]t is, emphatically, the province and duty of the judicial department to say what the law is.'" (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803))). If the judiciary's responsibility to interpret Part B when disputes over its meaning arose were enough to confer standing, one could always sue the court clerk in any challenge to any state law. Standing, "perhaps the most important of the Article III justiciability doctrines," id. at 1572, would then become little more than an empty formality, easily satisfied in every case.

The plaintiffs seek standing, moreover, on the basis of their bald assertion that Smith is statutorily responsible for deciding whether to recognize out-of-state marriages in the sense that if a couple with an out-of-state marriage attempts to obtain an Oklahoma marriage license, Smith's office ascertains whether the out-of-state marriage is valid for purposes of determining whether the couple is qualified to receive an Oklahoma license. At oral argument, counsel for the plaintiffs elaborated on the point, explaining that if the ban is nullified in this litigation, same-sex couples in Oklahoma who were validly

married in other states, like the Barton couple, would seek Oklahoma marriage licenses, and the court clerks would then determine the validity of those foreign marriages. This, however, is a strained argument. And, in light of the burden that the plaintiffs were obliged to carry at the summary-judgment stage, it is patently unavailing.

The Smith affidavit was presented to the district court as an attachment to her motion for summary judgment. To show standing on non-recognition in the face of Smith's unequivocal disavowal of any involvement in marriage recognition, the plaintiffs were not entitled in responding to the affidavit to depend on "'mere allegations'" regarding standing; rather, they were required to "'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citation omitted) (quoting Fed. R. Civ. P. 56(e)); accord Bronson, 500 F.3d at 1111 n.10.[12] Despite Smith's affidavit, the plaintiffs produced no such evidence indicating that Smith would in fact inquire into the validity of their California marriage in the event they sought an Oklahoma license, and no evidence that they ever even intended to seek an Oklahoma marriage license. In short, they produced no evidence generating even a

_____

[12] Of course, if the Barton couple had been entitled to a finding of standing on the basis of law of the case, they would not have been required to demonstrate their standing before the district court, or here. That is to say, had there been no new evidence to sufficiently undermine the effect of the law of the case of Bishop I, then Bishop I would have been enough, without more, to establish standing. See Christianson, 486 U.S. at 816 n.5 ("There is no reason to apply law-of-the-case principles less rigorously to [a jurisdictional issue]."). But since there was new evidence that did effectively undermine Bishop I's non-recognition standing holding, the Barton couple had to meet their summary-judgment burden in rebutting that evidence. See, e.g., Clark, 590 F.3d at 1140 (describing new evidence as a reason to "depart from the [law of the case] doctrine" (emphasis added)); United States v. Parada, 577 F.3d 1275, 1280 (10th Cir. 2009) (same).

possibility that Smith would ever be called upon to evaluate the validity of their California marriage.

Even assuming that the Barton couple had sought a marriage license from Smith, or intended to do so, it is implausible to imagine that Smith would have inquired into the validity of their California marriage. Looking at the state of the world at the time the suit was filed, as the law instructs, see Jordan v. Sosa, 654 F.3d 1012, 1019 (10th Cir. 2011); Utah Ass'n of Cntys. v. Bush, 455 F.3d 1094, 1099 (10th Cir. 2006), the standing inquiry must be predicated on the existence of a valid ban on same-sex marriage in Oklahoma. If the Barton couple had sought an Oklahoma marriage license in the face of the ban, it would have been odd, to say the least, for Smith to investigate the validity of their California marriage rather than denying them a license outright pursuant to the unambiguous mandate of a law that she was duty-bound to follow. That being the case, the plaintiffs have no believable hypothetical under which Smith would even be considering the validity of the Barton couple's marriage, and hence no believable hypothetical rendering her a source of relief for their non-recognition injury. This theory is simply too conjectural to warrant a finding of redressability. See Kerr, 744 F.3d at 1171 (reiterating that "an injury is redressable if a court concludes it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" (quoting Lujan, 504 U.S. at 561)); accord Petrella, 697 F.3d at 1294.

There are other state officials with a much closer and more concrete relationship to the withholding of recognition than any courthouse staff, including Smith. The most salient example lies in the area of taxation. In Oklahoma, the Tax Commission presides

over the State's tax system.  See Okla. Stat. tit. 68, § 203.  One of the Commission's responsibilities is to accept or deny joint tax returns mailed in by couples.  See Grasso v. Okla. Tax Comm'n, 249 P.3d 1258, 1261 (Okla. Civ. App. 2011).  With that scheme in place, a non-recognition plaintiff could file a joint tax return, have that status denied, and then sue the members of the Tax Commission.  See, e.g., Baskin v. Bogan, ___ F. Supp. 2d ___, 2014 U.S. Dist. LEXIS 86114, at *15, *50 (S.D. Ind. 2014) (finding the commissioner of the state department of revenue a proper party and ordering him to permit same-sex couples to file joint tax returns); cf. Rott v. Okla. Tax Comm'n, No. CIV-13-1041-M, 2014 U.S. Dist. LEXIS 77173, at *2-4 (W.D. Okla. June 6, 2014) (describing an action brought against, inter alia, members of the Oklahoma Tax Commission for wrongfully assessing and attempting to collect income taxes from the plaintiff in violation of his federal constitutional rights).

Other equally straightforward paths to redressability are easy enough to imagine, and several have in fact been taken in similar challenges being litigated elsewhere.  See, e.g., Tanco v. Haslam, ___ F. Supp. 2d ___, 2014 U.S. Dist. LEXIS 33463, at *9, *33-34 (M.D. Tenn. 2014) (sustaining a non-recognition challenge where the plaintiffs sued the commissioner of the department of finance and administration after they were prevented from using a family health insurance plan provided by a public university); Bostic v. Rainey, 970 F. Supp. 2d 456, 461-63, 484 (E.D. Va. 2014) (sustaining a non-recognition challenge where the plaintiffs sued the state registrar of vital records to obtain a birth certificate so that they could legally adopt the daughter they raise together); Obergefell v. Wymyslo, 962 F. Supp. 2d 968, 972-73, 1000 (S.D. Ohio 2013) (sustaining a non-

recognition challenge where the plaintiffs sued the director of the state department of

health to obtain a death certificate listing the couple as married).[13]

The distinction between Smith and a proper defendant, moreover, is not a

distinction between discretionary decisions enforcing the non-recognition provision and

ministerial decisions doing so. In all relevant respects, a tax commissioner's decision to

withhold joint-filing status is, as a practical matter, just as ministerial as Smith's decision

to withhold recognition. Both officials are responsible for faithfully applying Oklahoma

law, and Oklahoma law clearly instructs both of them to withhold marital status from

---

[13] That the plaintiffs' action was in part for a declaratory judgment does not affect the standing analysis. Like any lawsuit, a declaratory-judgment action must meet Article III's standing criteria, including redressability. See Consumer Data Indus. Ass'n, 678 F.3d at 906; City of Hugo v. Nichols (Two Cases), 656 F.3d 1251, 1263-64 (10th Cir. 2011). As part of the redressability requirement, a declaratory-judgment action must be brought against a defendant who can, if ordered to do so, remedy the alleged injury. See Coll v. First Am. Title Ins. Co., 642 F.3d 876, 892 (10th Cir. 2011); Bronson, 500 F.3d at 1111. Since Smith cannot provide relief to the Barton couple on their non-recognition claim, they had no standing to sue her, regardless of whether the claim was brought in a declaratory-judgment form or not.

Similarly, the doctrine of actionable conduct capable of repetition yet evading review is not applicable here. As an initial matter, the doctrine creates an exception to mootness, not to lack of standing. See United States v. Juvenile Male, 131 S. Ct. 2860, 2865 (2011) (per curiam); Buchheit v. Green, 705 F.3d 1157, 1160 (10th Cir. 2012); see also Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239, 1242-43 (10th Cir. 2011) (acknowledging that the capable-of-repetition-yet-evading-review class of cases constitutes an exception to mootness and noting that such "exceptions do not extend to the standing inquiry"). The Barton couple's claim is plainly not moot, as they continue to desire recognition for their marriage and continue to be denied such recognition. See United States v. Alaska, 503 U.S. 569, 575 n.4 (1992) ("We agree that the controversy is not moot, since it involves a continuing controversy . . . ."). At any rate, to the extent the capable-of-repetition-yet-evading-review test does go to redressability, the complained-of conduct, i.e., the denial of marriage recognition, does not evade review. Rather, as discussed above, a non-recognition couple could easily seek recognition from the State in some fashion, such as by filing a joint tax return, and when recognition was denied, the couple could then sue the official responsible for that non-recognition decision.

same-sex couples.  If the Barton couple had expressed a wish to file joint taxes and named a tax official responsible for authorizing that filing, there would be no doubt that a court order to the official would remedy the couple's non-recognition injury: the official would then accept the joint return.  See Baskin, 2014 U.S. Dist. LEXIS 86114, at *15, *50 (finding the commissioner of the state department of revenue a proper party and ordering him to permit same-sex couples to file joint tax returns).  There is no analogue with respect to Smith.  The supposition that Smith will have any specific involvement in recognizing or declining to recognize the Barton couple's marriage lacks any demonstrated foundation in the record or in Oklahoma law.[14]

Unable to demonstrate standing on their principal non-recognition injury—the refusal of the State to recognize their marriage—the plaintiffs seek to rely upon a different injury.  Specifically, the plaintiffs insist they have standing because "the injury of shutting the state courthouse doors on Plaintiffs—on top of the injuries of . . . non-recognition—would be redressed by an injunction against [Part B]."  As Smith correctly points out, though, the Barton couple did not challenge Part B on the grounds that it foreclosed their right to access the state court system.  Rather, they challenged it on the grounds that it violated their equal-protection and due-process rights to have their marriage recognized.  Crucially, the district court never heard a contention from the

---

[14] In the plaintiffs' eyes, standing on non-recognition can be found by virtue of the fact that Smith, and the court system that employs her, would not refuse to honor a court order enjoining enforcement of Part B.  It is of no moment that Smith would presumably obey a judicial invalidation of Part B if she were directed to enforce the provision.  The problem is there is no reason to believe that she enforces the provision at all, and thus no conceivable injunction for her to obey

Barton couple that Part B visited upon them an access-to-the-courts injury,[15] and it was their obligation to show standing.  See Kerr, 744 F.3d at 1163; Petrella, 697 F.3d at 1293. The district court could not have entertained jurisdiction over a claim on the basis of redressability for an injury that the Barton couple never alleged.

In sum, the Barton couple had no standing to sue, and the district court properly dismissed their non-recognition challenge as a result.

## C

In a final attempt to nullify Part B along with Part A, the plaintiffs submit—for the first time on appeal—that the non-recognition provision must be struck down under severability law as soon as the ban is struck down, no matter whether there was standing to challenge the non-recognition provision or not.  For her part, Smith asks for a finding that the plaintiffs forfeited their severability theory by failing to raise it in the district court.  The plaintiffs do not deny that they omitted the argument from their summary-judgment filings, and a review of those filings finds no trace of severability doctrine. Nevertheless, the plaintiffs request that we take account of severability if the ban falls, regardless of the issue's preservation, because—in their view—a severability analysis is required whenever a court declares invalid part of an enactment.

---

[15] In their response to Smith's motion for summary judgment, the plaintiffs did submit in passing that Smith's affidavit might create an injury in its own right, namely, the erection of "a barrier making it more difficult for members of a group to obtain a benefit."  However, the plaintiffs did not frame this argument in terms of access to the state court system, and it is more naturally read as a point about access to the federal court system.  After all, a finding of no standing on the basis of Smith's affidavit removes the Barton couple from federal court, not from state court.

At the outset, it is necessary to determine the controlling source of law. The question of whether an unconstitutional provision of state law is severable from the remainder of the enactment is a matter of state law. See Leavitt v. Jane L., 518 U.S. 137, 139 (1996) (per curiam); accord Am. Target Adver., Inc. v. Giani, 199 F.3d 1241, 1250 (10th Cir. 2000). So too is the question of whether a severability analysis is triggered in the first place by the facts of the case, i.e., whether the type of judicial ruling at issue calls for a severability inquiry. See Local 514 Transp. Workers Union of Am. v. Keating, 66 F. App'x 768, 779 (10th Cir. 2003) (certifying to the Oklahoma Supreme Court the question of whether severability analysis applied to certain state constitutional provisions if they were declared preempted by federal law); Local 514 Transp. Workers Union of Am. v. Keating, 83 P.3d 835, 839 (Okla. 2003) (answering that severability analysis would not apply and holding that "whether to apply severability analysis . . . [was] a matter of state law"); see also Local 514 Transp. Workers Union of Am. v. Keating, 358 F.3d 743, 744 n.1 (10th Cir. 2004) (subsequently deciding the appeal on the basis of the Oklahoma Supreme Court's answer and incorporating the certification into the published opinion).

Unlike substantive severability law, though, the matter of whether an argument has been forfeited by a party's failure to raise it in the district court is decided by federal procedural law. That proposition is underscored by the fact that when we have found an argument forfeited by its omission in district court proceedings in a diversity case— where we are applying substantive state law—we have supported our forfeiture ruling with citations to Tenth Circuit decisions that are either applying substantive federal law

-41-

or the substantive law of a different state.  See, e.g., Elm Ridge Exploration Co. v. Engle, 721 F.3d 1199, 1213 (10th Cir. 2013); Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003, 715 F.3d 1231, 1234 n.1 (10th Cir. 2013); Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1176 n.20 (10th Cir. 2010).

More relevant to the case at bar, in Awad v. Ziriax, 670 F.3d 1111, 1132 n.16 (10th Cir. 2012), we applied a federal approach to a highly analogous situation.  In Awad, a popular vote approved a proposal to add to the state constitution a provision that included, inter alia, language forbidding Oklahoma courts from considering Sharia law in rendering their decisions.  Id. at 1117-18.  The district court issued a preliminary injunction, ordering state officials not to certify the election result until the court had ruled on the merits of a federal constitutional challenge to the proposed amendment.  Awad v. Ziriax, 754 F. Supp. 2d 1298, 1308 (W.D. Okla. 2010).  On appeal, we affirmed the preliminary injunction.  Awad, 670 F.3d at 1133.  We attached the following footnote to the end of our substantive analysis:

> Appellants raised the issue of severability of the Sharia law portions of the amendment for the first time to this court in post-oral argument supplemental briefing.  Their argument consisted of one sentence and cited no authority, stating that if this court decides the Sharia law provisions in the amendment render the amendment invalid, "the court should simply treat the explicatory example as surplusage, and strike it."  Because this issue has not been adequately briefed, we do not address it.  See United States v. Cooper, 654 F.3d 1104, 1128 (10th Cir. 2011).

Id. at 1132 n.16.  In other words, in a federal constitutional challenge to an Oklahoma constitutional provision, we upheld, at least preliminarily, a decision striking down the provision and declined to consider severability because of a failure to adequately preserve

the issue for review—specifically, a waiver of the issue through deficient briefing.  The

Awad footnote is only explicable if an appellate court has no inherent obligation to

consider severability sua sponte, as it would with, say, a jurisdictional issue.  See, e.g.,

United States v. Ramos, 695 F.3d 1035, 1046 (10th Cir. 2012), cert. denied, 133 S. Ct.

912 (2013); Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1375-76 (10th Cir.

2011).

As in Awad, this court is upholding here a decision striking down a provision of

the Oklahoma Constitution on federal constitutional grounds, and, as in Awad, the

litigant failed to adequately preserve the issue for review—this time, by effecting a

forfeiture through failure to present the issue to the district court.  There is no apparent

reason why the result the court reached in Awad should not be the same here.  In other

words, the same principle should have equal purchase in the forfeiture context: if there is

no obligation to consider severability sua sponte where it has been waived,[16] there is no

obligation to consider it where it has been forfeited.

Having thus resolved the issue of whether in a forfeiture context the court is

obligated to consider severability, "the decision regarding what issues are appropriate to

entertain on appeal in instances of lack of preservation is discretionary."  Abernathy v.

Wandes, 713 F.3d 538, 552 (10th Cir. 2013), cert. denied, 134 S. Ct. 1874 (2014).

Waiver through appellate-briefing omission and forfeiture through silence before the

---

[16] The parties in Kitchen did not address severability in their appellate briefing, thereby rendering the issue waived in that case through briefing omission and relieving this court of any responsibility to discuss the matter in its opinion.  See United States v. Bader, 678 F.3d 858, 894 (10th Cir. 2012) (observing that a litigant's briefing omissions prompt the conclusion that he or she "has waived [the] argument").

district court are admittedly distinct failures of preservation, and arguably there is more discretionary leeway to consider issues not preserved under the latter (forfeiture) than the former (appellate-briefing waiver). See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1128-30 (10th Cir. 2011) (exploring the distinction between forfeiture and waiver, including waiver through omissions in appellate briefs); see also United States v. McGehee, 672 F.3d 860, 873 (10th Cir. 2012) ("'Unlike waived theories, we will entertain forfeited theories on appeal . . . .'" (quoting Richison, 634 F.3d at 1128)). However, where a litigant attempts to rely upon a forfeited theory, "'the failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.'" United States v. Lamirand, 669 F.3d 1091, 1100 n.7 (10th Cir. 2012) (omission in original) (quoting Richison, 634 F.3d at 1131). The plaintiffs are at the end of the road here.

In essence, in arguing for reversal, the plaintiffs are asserting that the district court erred in refusing to enjoin Part B in addition to Part A under severability law, despite their alleged lack of standing to challenge the former. They offer no explanation as to how the district court plainly erred in this regard.[17] In fact, the plaintiffs' only response to Smith's forfeiture argument is that a severability theory is not susceptible to forfeiture. As noted above, that is incorrect—pursuant to Awad, the plaintiffs could in fact forfeit

_____

[17] A litigant may obtain relief under the plain-error doctrine upon a showing of "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If [she] satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Goode, 483 F.3d 676, 681 (10th Cir. 2007) (quotation omitted).

their severability argument, and they did.[18]  Therefore, absent any argument by the plaintiffs for plain error, much less a cogent one, it is appropriate to decline to exercise the court's discretion to hear this forfeited severability issue.

To recapitulate, a severability theory can be forfeited, the plaintiffs' severability theory was forfeited, and the plaintiffs supply no argument for overlooking the forfeiture. As a consequence, they are not entitled to the benefit of any severability analysis, and the district court's dismissal of the challenge to Part B must be affirmed.[19]

That the non-recognition claim is doomed to dismissal may seem a harsh result. The Barton couple first challenged Part B almost ten years ago.  After the first appeal, the plaintiffs fairly understood Bishop I as a directive instructing them to name Smith as the lone defendant for all of their grievances.  It was reasonable of the Barton couple to follow that perceived directive, and it is regrettable that their compliance has resulted in a

---

[18] The plaintiffs use Brockett v. Spokane Arcades, Inc., 472 U.S. 491 (1985), and Panhandle Eastern Pipeline Co. v. State of Oklahoma ex rel. Commissioners of Land Office, 83 F.3d 1219 (10th Cir. 1996), to bolster their view that a court has an obligation to consider severability even in the face of forfeiture.  Cf. Acosta v. City of Costa Mesa, 694 F.3d 960, 974 n.7 (9th Cir. 2012) (relying upon Brockett, inter alia, to support the proposition that "severability is an inherent part of the process of constitutional adjudication" that is not subject to waiver by omission from appellate briefs), withdrawn, 708 F.3d 1122 (9th Cir. 2013).  Neither Brockett nor Panhandle nor any of the other Supreme Court cases cited by Acosta say anything about forfeiture or waiver, or anything about whether severability had been raised or argued to the trial or appellate courts. Given this silence, the explicit invocation of waiver by Awad in a comparable case is controlling here on the question of whether severability must be considered sua sponte.

[19] Because the plaintiffs' severability theory is forfeited, there is no need to consider Smith's argument that a severability analysis regarding Part B is foreclosed by the plaintiffs' lack of standing to challenge that provision.  See Sinochem Int'l Co., 549 U.S. at 431 (authorizing federal courts to choose at their discretion among alternative threshold grounds for disposing of a claim without reaching its merits); accord Niemi, 728 F.3d at 1260.

lack of standing, especially after nearly a decade of complex, time-consuming, and no doubt emotional litigation.

No matter how compelling the equitable arguments for reaching the merits of the non-recognition claim, however, its fate must be determined by the law, and the law demands dismissal. The frustration that may be engendered by the court's disposition today should be tempered, however. Although it would not be appropriate to definitively opine on the matter, it is fair to surmise that the court's decision in Kitchen casts serious doubt on the continuing vitality of Part B. See 2014 U.S. App. LEXIS 11935, at *4 ("A state may not . . . refuse to recognize [a] marriage . . . based solely upon the sex of the persons in the marriage union.").

## IV

For the foregoing reasons, we **AFFIRM**. We **STAY** our mandate pending the disposition of any subsequently-filed petition for writ of certiorari. See Fed. R. App. P. 41(d)(2); see also Kitchen, 2014 U.S. App. LEXIS 11935, at *97-98.

Nos. 14-5003 & 14-5006, <u>Mary Bishop et al. v. Sally Howe Smith et al.</u>

**HOLMES**, Circuit Judge, concurring.

In upholding the district court's substantive ruling in this case, the majority concludes that Oklahoma's same-sex marriage ban—found in SQ 711[1]—impermissibly contravenes the fundamental right to marry protected by the Due Process and Equal Protection Clauses of the Constitution. I fully agree with that conclusion and endorse without reservation the reasoning of the majority on this matter.[2]

I write here, however, to focus on one significant thing that the district court wisely did <u>not</u> do in rendering its substantive ruling on the same-sex marriage ban. Specifically, the district court declined to rely upon animus doctrine in striking down SQ 711. <u>See</u> <u>Bishop v. U.S. ex rel. Holder</u>, 962 F. Supp. 2d 1252, 1285 n.32 (N.D. Okla. 2014). Most of the other recent judicial decisions invalidating same-sex marriage laws have exercised the same

---

[1] Following the majority opinion, I will refer to Oklahoma's same-sex marriage provision embodied in its constitution, Okla. Const. art. II, § 35, as "SQ 711." Also in keeping with the majority opinion, I will refer to SQ 711's ban on same-sex marriage as "Part A" and will refer to SQ 711's non-recognition clause as "Part B."

[2] I also fully embrace the remainder of the majority's opinion (both its outcome and reasoning) regarding the non-recognition claim: that is, that the Barton couple lacked standing to pursue that claim and that Part B cannot be invalidated pursuant to severability law because the plaintiffs forfeited their severability argument.

forbearance.[3]  However, several district court decisions from other jurisdictions have taken a different tack and suggested that similar laws may suffer from unconstitutional animus.  See Baskin v. Bogan, --- F. Supp. 2d ----, 2014 WL 2884868, at \*14 (S.D. Ind. 2014); Henry v. Himes, --- F. Supp. 2d ----, 2014 WL 1418395, at \*6 (S.D. Ohio 2014); De Leon v. Perry, 975 F. Supp. 2d 632, 655 (W.D. Tex. 2014); Obergefell v. Wymyslo, 962 F. Supp. 2d 968, 995–96 (S.D. Ohio 2013).  This concurrence endeavors to clarify the relationship between animus doctrine and same-sex marriage laws and to explain why the district court made the correct decision in declining to rely upon the animus doctrine.

I will begin by setting forth the contours of the animus doctrine as those contours have been drawn by the Supreme Court's case law.  Then, I will elucidate why SQ 711 falls outside of those boundaries and why it is consequently free from impermissible animus.

---

[3]  See Kitchen v. Herbert, --- F.3d ----, 2014 WL 2868044, at \*32 (10th Cir. 2014); Love v. Beshear, --- F. Supp. 2d ----, 2014 WL 2957671, at \*7 n.14 (W.D. Ky. 2014); Wolf v. Walker, --- F. Supp. 2d ----, 2014 WL 2558444, at \*33 (W.D. Wis. 2014); Whitewood v. Wolf, --- F. Supp. 2d ----, 2014 WL 2058105, at \*15 (M.D. Pa. 2014); Geiger v. Kitzhaber, --- F. Supp. 2d ----, 2014 WL 2054264, at \*14 (D. Or. 2014); Latta v. Otter, --- F. Supp. 2d ----, 2014 WL 1909999, at \*28 (D. Idaho 2014); Baskin v. Bogan, --- F. Supp. 2d ----, 2014 WL 1568884, at \*3 (S.D. Ind. 2014); DeBoer v. Snyder, 973 F. Supp. 2d 757, 775 (E.D. Mich. 2014); Tanco v. Haslam, --- F. Supp. 2d ----, 2014 WL 997525, at \*6 (M.D. Tenn. 2014); Bostic v. Rainey, 970 F. Supp. 2d 456, 482 (E.D. Va. 2014); Bourke v. Beshear, --- F. Supp. 2d ----, 2014 WL 556729, at \*6–7 (W.D. Ky. 2014); Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1209–10 (D. Utah 2013), aff'd, 2014 WL 2868044; Griego v. Oliver, 316 P.3d 865, 888 (N.M. 2013).

# I

To understand why animus doctrine is not dispositive in this appeal, one must understand three basic features of the doctrine: (1) what is animus; (2) how is it detected; and (3) what does a court do once it is found. I will address each question in turn, before applying the answers to the case at bar.

## A

Beginning with first principles, when a state law is challenged on equal-protection grounds, and when that law does not implicate a fundamental right, a federal court ordinarily decides what type of analysis to apply on the basis of what sort of characteristic the State is using to distinguish one group of citizens from another. If the law uses a suspect classification, like race, strict scrutiny applies. See Johnson v. California, 543 U.S. 499, 505–06 (2005); Riddle v. Hickenlooper, 742 F.3d 922, 927 (10th Cir. 2014). If the law uses a quasi-suspect classification, like gender, intermediate scrutiny applies. See United States v. Virginia, 518 U.S. 515, 532–33 (1996); Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210 (10th Cir. 2002). For all other classifications, rational-basis review is typically appropriate. See Armour v. City of Indianapolis, --- U.S. ----, 132 S. Ct. 2073, 2079–80 (2012); Brown v. Montoya, 662 F.3d 1152, 1172 (10th Cir. 2011).

The animus cases depart from this well-trod path. In those cases, the Supreme Court took up equal-protection challenges to government action that

distinguished between people on the basis of characteristics that the Court had <u>not</u>

deemed suspect or quasi-suspect.  <u>See</u> <u>Romer v. Evans</u>, 517 U.S. 620, 624 (1996)

(describing the challenged law as classifying on the basis of sexual orientation);

<u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 436–37 (1985)

(describing the challenged law as classifying on the basis of intellectual

disability); <u>U.S. Dep't of Agric. v. Moreno</u>, 413 U.S. 528, 530 (1973) (describing

the challenged law as classifying between households where the members were

related to one another and households where they were not[4]); <u>see also</u>

_____

[4] A pair of Supreme Court cases handed down a day apart in 1982 are occasionally also included in lists of the Court's animus decisions: <u>Plyler v. Doe</u>, 457 U.S. 202 (1982), and <u>Zobel v. Williams</u>, 457 U.S. 55 (1982).  <u>See, e.g.</u>, <u>Milner v. Apfel</u>, 148 F.3d 812, 816 (7th Cir. 1998) (including <u>Plyler</u> and <u>Zobel</u> in a list of the Court's animus cases); Susannah W. Pollvogt, <u>Unconstitutional Animus</u>, 81 Fordham L. Rev. 887, 899–900 (2012) (same).  A careful reading of these two decisions, however, causes me to disagree with this inclusion.  <u>See</u> <u>Plyler</u>, 457 U.S. at 227–30; <u>Zobel</u>, 457 U.S. at 60–64.  Although <u>Plyler</u> and <u>Zobel</u> arguably undertake a slightly more penetrating analysis, rooted in the States' arguments, than commonly found in rational-basis cases, the Court's gaze in the two cases still extends no further than the "<u>colorable</u> state interests that <u>might</u> support" the challenged classification.  <u>Plyler</u>, 457 U.S. at 227 (emphases added); <u>see</u> <u>Zobel</u>, 457 U.S. at 61 & 61 n.7 (noting the State's proffered "three purposes justifying the distinctions made by" the challenged classification and noting that the Court "need not speculate as to the objectives of the legislature" because they were codified in the legislation at issue).  As such, <u>Plyler</u> and <u>Zobel</u> are, at the very least, more akin to the mine-run rational-basis cases than they are to the animus cases, which (as noted <u>infra</u>) have as their hallmark looking beyond colorable interests promoted by the challenged law into the <u>actual</u> motivation behind the governmental action at issue.  This <u>sui generis</u> form of equal-protection review is absent in <u>Plyler</u> and <u>Zobel</u>; accordingly, I will not rely upon those cases in my discussion of the animus doctrine.  <u>See</u> <u>Massachusetts v. U.S. Dep't of Health & Human Servs.</u>, 682 F.3d 1, 10 (1st Cir. 2012) (limiting the list

(continued...)

Massachusetts, 682 F.3d at 10 ("In [Moreno, Cleburne, and Romer], the Supreme Court has now several times struck down state or local enactments without invoking any suspect classification."). Because the classifications at issue in the animus line of cases did not involve suspect or quasi-suspect groups, one would have expected the Court to consider the laws under conventional rational-basis review. See Armour, 132 S. Ct. at 2079–80; Brown, 662 F.3d at 1172. But that was not what happened.

In the run-of-the-mill rational-basis case, the Court asks whether the litigant challenging the state action has effectively "negative[d] 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001) (emphasis added) (quoting Heller v. Doe ex rel. Doe, 509 U.S. 312, 320 (1993)) (internal quotation marks omitted); accord Ebonie S. ex rel. Mary S. v. Pueblo Sch. Dist. 60, 695 F.3d 1051, 1059 (10th Cir. 2012) (parroting Supreme Court precedent in noting that we must uphold a law on rational-basis review if "there is any reasonably conceivable state of facts that could provide a rational basis for [the classification]" (quoting Copelin-Brown v. N.M. State Pers. Office, 399 F.3d

---

4(...continued)
of the Supreme Court's animus cases to Romer, Cleburne, and Moreno); Tiffany C. Graham, Rethinking Section Five: Deference, Direct Regulation, and Restoring Congressional Authority to Enforce the Fourteenth Amendment, 65 Rutgers L. Rev. 667, 716 (2013) (same).

1248, 1255 (10th Cir. 2005)) (internal quotation marks omitted)), <u>cert. denied</u>, ---
U.S. ----, 133 S. Ct. 1583 (2013).  Defying expectations, the Supreme Court in the
animus cases did not pose that broad question.

Rather than relying upon the various post-hoc rationalizations that <u>could</u>
conceivably have justified the laws, the Court focused on the motivations that
<u>actually</u> lay behind the laws.  <u>See</u> <u>Romer</u>, 517 U.S. at 634 (emphasizing that the
challenged law was "<u>born of animosity</u> toward the class of persons affected"
(emphasis added)); <u>Cleburne</u>, 473 U.S. at 450 (remarking that the challenged law
"<u>rest[ed] on</u> an irrational prejudice against the [intellectually disabled]" (emphasis
added)); <u>Moreno</u>, 413 U.S. at 534 (noting that "[t]he legislative history [of the
challenged law] indicate[d] that th[e] amendment <u>was intended to</u> prevent
socalled 'hippies' and 'hippie communes' from participating in the food stamp
program" (emphasis added)); <u>see also</u> <u>Am. Express Travel Related Servs. Co. v.</u>
<u>Kentucky</u>, 641 F.3d 685, 692 (6th Cir. 2011) ("In each of the [animus cases], the
Supreme Court . . . concluded that the legislation at issue <u>was in fact intended to</u>
<u>further an improper government objective</u>." (emphasis added)).

Since the animus cases dealt with non-suspect groups, and yet did not
invoke the rational-basis test in its classic form, the jurisprudence does not fit
easily into the tiers of scrutiny that attach to most equal-protection claims.  As a
result, the type of review used in the animus decisions has been given a number
of different labels.  Sometimes the cases are simply lumped together with all

other rational-basis cases. See, e.g., Price-Cornelison v. Brooks, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008) (interpreting Romer as a rational-basis case). Sometimes the animus cases are said to apply "heightened rational-basis review," see, e.g., Kleinsmith v. Shurtleff, 571 F.3d 1033, 1048 (10th Cir. 2009), or—more colorfully—"rational basis with bite," see, e.g., Kenji Yoshino, The New Equal Protection, 124 Harv. L. Rev. 747, 760 (2011), "rational basis with teeth," see, e.g., Michael E. Waterstone, Disability Constitutional Law, 63 Emory L.J. 527, 540 (2014) (internal quotation marks omitted), or "rational basis plus," see, e.g., Marcy Strauss, Reevaluating Suspect Classifications, 35 Seattle U. L. Rev. 135, 135 n.5 (2011) (internal quotation marks omitted).

For present purposes, it is of no moment what label is affixed to the distinctive equal-protection mode of analysis that is performed in the animus cases. What is important is to know when and how to conduct that analysis. As suggested above, the hallmark of animus jurisprudence is its focus on actual legislative motive. In the interest of analytical precision, it is important to clarify exactly what types of legislative motive may be equated with animus. Those motives could be viewed as falling somewhere on a continuum of hostility toward a particular group.[5] See Black's Law Dictionary 806 (9th ed. 2009) (defining

---

[5] Some of the plaintiffs' amici interpret the animus cases quite broadly, to the extent that they understand them for all intents and purposes not to involve hostility at all. See, e.g., Equality Utah Found. & Utah Pride Ctr. Br. at

(continued...)

"hostile," in the relevant entry, as "[a]ntagonistic; unfriendly"); New Oxford American Dictionary 818 (2d ed. 2005) (defining "hostile," in the relevant entries, as "unfriendly; antagonistic," and "opposed"); Webster's Third New International Dictionary 1094 (2002) (defining "hostile," in the relevant entries, as "marked by antagonism or unfriendliness," "marked by resistance esp[ecially] to new ideas," and "unfavorable esp[ecially] to the new or strange").

On the weaker end of the continuum, a legislative motive may be to simply exclude a particular group from one's community for no reason other than an "irrational prejudice" harbored against that group. Cleburne, 473 U.S. at 450. In this sense, animus may be present where the lawmaking authority is motivated solely by the urge to call one group "other," to separate those persons from the rest of the community (i.e., an "us versus them" legal construct). See Romer, 517

_____

[5](...continued)
10 ("While the Supreme Court has sometimes suggested that laws drawn for the purpose of disadvantaging a group are based on 'animus,' that term simply denotes the absence of an 'independent and legitimate' purpose for the law, not a subjective disdain for or dislike of a particular class." (quoting Romer, 517 U.S. at 632–33)); Joan Heifetz Hollinger et al. Br. at 4 n.8 ("'Animus' as used in Romer is a term of art and does not mean subjective dislike or hostility, but simply the absence of any rational reason for excluding a particular group from protections."). That is, in my view, simply not a plausible reading of the animus cases, which have targeted laws "born of animosity toward the class of persons affected," Romer, 517 U.S. at 634 (emphasis added), and laws motivated by "a bare congressional desire to harm a politically unpopular group," Moreno, 413 U.S. at 534 (emphasis added). See Pollvogt, supra, at 888 ("In short, animus, including hostility toward a particular social group, is never a valid basis for legislation or other state action." (emphasis added)).

U.S. at 635 (invalidating "a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit"); <u>Cleburne</u>, 473 U.S. at 448 ("[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the [intellectually disabled] differently from apartment houses, multiple dwellings, and the like."); <u>see also</u> <u>Bowers v. NCAA</u>, 475 F.3d 524, 554 (3d Cir. 2007) (interpreting <u>Cleburne</u> as prohibiting the construction of "a caste system"). On the more extreme end of the continuum, the legislative motive that implicates the animus doctrine may manifest itself in a more aggressive form—specifically, a "<u>desire to harm</u> a politically unpopular group." <u>Moreno</u>, 413 U.S. at 534 (emphasis added). At either end of this continuum, and everywhere in between, at its core, legislative motivation of this sort involves hostility to a particular group and, consequently, implicates the animus doctrine.

B

Having settled the question of what constitutes animus, there remains the question of how one knows when one has found it. As explained in the following sections, the animus cases instruct us to explore challenged laws for signs that they are, as a <u>structural</u> matter, aberrational in a way that advantages some and disadvantages others. Two types of structural aberration are especially germane here: (1) laws that impose wide-ranging and novel deprivations upon the disfavored group; and (2) laws that stray from the historical territory of the

lawmaking sovereign just to eliminate privileges that a group would otherwise receive.[6] These two rough categories of structural unusualness are neatly underscored by the Supreme Court's two most recent statements on equal-protection law in the arena of sexual orientation: <u>Romer</u> and <u>Windsor</u>.[7] Both will

_____

[6] It bears mention that the Supreme Court has periodically consulted legislative history materials in its search for unconstitutional animus. <u>See</u> <u>United States v. Windsor</u>, --- U.S. ----, 133 S. Ct. 2675, 2693 (2013) (considering a House Report in concluding that the "essence" of the Defense of Marriage Act ("DOMA") was "interference with the equal dignity of same-sex marriages"); <u>Moreno</u>, 413 U.S. at 534 (detailing legislative history to demonstrate that the challenged enactment "was intended to prevent socalled 'hippies' and 'hippie communes' from participating in the food stamp program"). Notably, though, the Supreme Court has never taken into account such materials when weighing the constitutionality of a popularly-enacted law—one based upon votes directly cast by citizens—like the one before us. And it has had the opportunity to do so. <u>Romer</u> involved a state constitutional amendment that was passed by referendum, just as our case does. 517 U.S. at 623. Yet the Court did not rely on campaign literature in striking down the measure, training its gaze instead on the <u>structural</u> attributes of the amendment that were suggestive of animus, such as its breadth and the novelty of its effects on the injured class. <u>See</u> <u>id.</u> at 626–35. That is not surprising. The scope of a popular poll makes it difficult, if not impossible, for a court to apprehend the "intent" of individual voters from record evidence and, therefore, makes it improvident to ascribe hostility to that intent and to nullify the will of the citizenry on that basis. <u>See</u> <u>Latta</u>, 2014 WL 1909999, at *21 ("Because over 280,000 Idahoans voted for Amendment 2, it is not feasible for the Court to infer a particular purpose or intent for the provision."); Fred O. Smith, Jr., <u>Due Process, Republicanism, and Direct Democracy</u>, 89 N.Y.U. L. Rev. 582, 610 (2014) ("There is a resounding absence of [a meaningful legislative] record when voters directly enact measures.").

[7] Notably, the Supreme Court in <u>Windsor</u> did not expressly identify the tier of scrutiny that it applied in reviewing the challenged federal legislation. The extent to which <u>Windsor</u> is an animus case—as opposed to, most saliently here, a fundamental-rights case—is not pellucid. <u>Compare</u> <u>Windsor</u>, 133 S. Ct. at 2692 ("Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form 'but one element in a personal

(continued...)

-10-

7(...continued)
bond that is more enduring.' By its recognition of the validity of same-sex marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond." (citation omitted) (quoting Lawrence v. Texas, 539 U.S. 558, 567 (2003))), and id. at 2694 ("The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, and whose relationship the State has sought to dignify." (citation omitted)), with id. at 2693 ("DOMA seeks to injure the very class New York seeks to protect."), and id. at 2695 ("[T]he principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage."). No matter how one describes the measure of animus doctrine at work in Windsor, it cannot be seriously contended that Windsor is entirely lacking in it. In addition to the quotes recited above, Windsor spoke in manifestly animus-inflected terms when it reaffirmed that "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group," id. at 2693 (quoting Moreno, 413 U.S. at 534–35), and when the Court reiterated, even more tellingly, that "[i]n determining whether a law is motivated by an improper animus or purpose, '[d]iscriminations of an unusual character' especially require careful consideration," id. (second alteration in original) (quoting Romer, 517 U.S. at 633) (internal quotation marks omitted). See also William D. Araiza, After the Tiers: Windsor, Congressional Power to Enforce Equal Protection, and the Challenge of Pointillist Constitutionalism, 94 B.U. L. Rev. 367, 368 (2014) (characterizing Windsor as an animus case); Daniel O. Conkle, Evolving Values, Animus, and Same-Sex Marriage, 89 Ind. L.J. 27, 39 (2014) ("The [Windsor] Court's primary argument . . . was that Congress had acted with illicit 'animus,' thus violating equal protection."); Darren Lenard Hutchinson, "Not Without Political Power": Gays and Lesbians, Equal Protection and the Suspect Class Doctrine, 65 Ala. L. Rev. 975, 977 (2014) ("[I]n Windsor, rather than considering whether gays and lesbians constitute a suspect class, the Court held simply that DOMA violates the Equal Protection Clause because it is a product of animus directed towards same-sex couples."); cf. SmithKline Beecham Corp. v. Abbott Labs., --- F.3d ----, 2014 WL 2862588, at *4 (9th Cir. 2014) (O'Scannlain, J., dissenting from denial of rehearing en banc) ("In declaring [DOMA § 3] to be motivated by no 'legitimate' purpose, Windsor only applies rational basis review in the same way that Romer reviewed Colorado's Amendment 2 for rational basis."). In the discussion that follows, I use Windsor exclusively with reference

(continued...)

be considered in detail below.

**1**

The first species of structural irregularity relating to the type of harm inflicted upon the injured class is powerfully captured by <u>Romer</u>. There, the Supreme Court struck down a Colorado constitutional amendment that prohibited <u>all</u> state entities from promulgating civil-rights protections specifically designated for homosexuals (or bisexuals) in <u>any</u> context. <u>Romer</u>, 517 U.S. at 635. The Court was moved to do so by the fact that the "disadvantage imposed [was] born of animosity toward the class of persons affected." <u>Id.</u> at 634. That is to say, animus entered the stage in <u>Romer</u> for the principal reason that the constitutional amendment before the Court was strikingly pervasive in obstructing homosexuals from obtaining any specially designated civil-rights protections whatsoever. <u>See</u> <u>id.</u> at 627 ("Sweeping and comprehensive is the change in legal status effected by this law."); <u>id.</u> at 632 ("[T]he amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group . . . ."); <u>id.</u> at 633 ("Amendment 2 . . . identifies persons by a single trait and then denies them protection across the board."). That sort of blanket burdening of a group and its rights, the Court cautioned, was unheard of and, as a consequence, inherently suspicious. <u>See</u> <u>id.</u> at 633 ("The resulting disqualification of a class of persons

---

[7](...continued)
to the animus aspect of its reasoning.

from the right to seek specific protection from the law is unprecedented in our jurisprudence."); id. ("It is not within our constitutional tradition to enact laws of this sort."). Stated differently, Romer applied the animus doctrine because a State had passed a law that pervasively constricted the rights of a group in a way that few, if any, laws had previously done. Cf. Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289, 299 (6th Cir. 1997) ("[T]he Romer majority's rejection of rational relationship assessment hinged upon the wide breadth of Colorado Amendment 2, which deprived a politically unpopular minority of the opportunity to secure special rights at every level of state law.").

**2**

The second species of structural irregularity is on display in Windsor. Specifically, prior to passage of DOMA, Congress had deferred to the States' definitional authority over marriage, an authority they enjoyed as part of their traditional police power in the domestic-relations sphere. See Windsor, 133 S. Ct. at 2691 (depicting family law as "an area that has long been regarded as a virtually exclusive province of the States" (internal quotation marks omitted)); id. ("The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations . . . ."); id. ("[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . ." (alteration in original) (internal quotation marks omitted)). DOMA represented a radical departure from that tradition, and it was

-13-

that departure that brought animus concerns to the fore in Windsor:

> When the State used its historic and essential authority to define the marital relation in this way, [i.e., to allow same-sex marriage,] its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community. DOMA, because of its reach and extent, departs from this history and tradition of reliance on state law to define marriage. "[D]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision."

Id. at 2692 (second alteration in original) (quoting Romer, 517 U.S. at 633) (internal quotation marks omitted). Shortly thereafter in Windsor, the Supreme Court drove the same point home:

> The responsibility of the States for the regulation of domestic relations is an important indicator of the substantial societal impact the State's classifications have in the daily lives and customs of its people. DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class.

Id. at 2693 (emphasis added). With these passages, the Court left no doubt that the animus doctrine was relevant to the disposition of the case because the federal government had gone beyond the federalism pale and intruded into a province historically monopolized by the States, and, what is more, that the federal government had done so solely to restrict the rights that would have otherwise been afforded to gay and lesbian individuals. See Conkle, supra, at 40 (interpreting the federalism concerns in Windsor as "directly linked to [the

-14-

Court's] animus rationale").

C

When a litigant presents a colorable claim of animus, the judicial inquiry searches for the foregoing clues. What happens when the clues are all gathered and animus is detected? The answer is simple: the law falls. Remember that under rational-basis review, the most forgiving of equal-protection standards, a law must still have a legitimate purpose. See Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000) (explaining that "when conducting rational basis review we will not overturn such [government action] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational" (alterations in original) (internal quotation marks omitted)); United States v. Angelos, 433 F.3d 738, 754 (10th Cir. 2006) ("To pass muster under the rational basis test, [the statute] must have a legitimate purpose . . . ." (internal quotation marks omitted)). A legislative motive qualifying as animus is never a legitimate purpose. See Romer, 517 U.S. at 632 ("[T]he amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."); Cleburne, 473 U.S. at 448 ("[M]ere negative attitudes, or fear, . . . are not permissible bases for [a statutory classification]."); Moreno, 413 U.S. at 534 ("[The] amendment was intended to prevent socalled 'hippies' and 'hippie communes' from participating in the food

stamp program," and such "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). In other words, once animus is detected, the inquiry is over: the law is unconstitutional.

This fearsome quality of animus jurisprudence has led one commentator to refer to it, most aptly, as "a doctrinal silver bullet." Pollvogt, supra, at 889. Conversely, if animus is not properly invoked—viz., if the clues do not add up to a picture of hostile lawmaking—the analysis returns to the traditional rational-basis realm and the Court commences a more generous search for "any reasonably conceivable state of facts that could provide a rational basis for the classification." Garrett, 531 U.S. at 367 (emphasis added) (internal quotation marks omitted); accord Ebonie S., 695 F.3d at 1059.

## II

Armed with these background principles, I am now well-situated to examine how animus operates—or does not—in the context of the instant appeal.

To review, ordinarily, a law falls prey to animus only where there is structural evidence that it is aberrational, either in the sense that it targets the rights of a minority in a dangerously expansive and novel fashion, see Romer, 517 U.S. at 631–35, or in the sense that it strays from the historical territory of the lawmaking sovereign just to eliminate privileges that a group would otherwise receive, see Windsor, 133 S. Ct. at 2689–95. The Oklahoma law at issue before us today is aberrational in neither respect. In fact, both considerations cut

strongly against a finding of animus.[8]

A

To begin, SQ 711 is not nearly as far-reaching as the state constitutional amendment that <u>Romer</u> invalidated. The amendment taken up by <u>Romer</u> forbade <u>any</u> unit of state government from extending to gay and lesbian persons <u>any</u> special privileges or protections. <u>See</u> 517 U.S. at 624 (reciting the language of

---

[8]    The district court found, "as a matter of law, that 'moral disapproval of same-sex marriage' existed in the public domain as at least one justification for voting in favor of SQ 711." <u>Bishop</u>, 962 F. Supp. 2d at 1289. In support of that finding, the district court cited statements made by several state legislators and by other supporters of the measure. <u>Id.</u> at 1288–89. The district court's analysis in this regard is most naturally read as relating to its conventional rational-basis review—wherein it considered moral disapproval as one conceivable basis for the law—not as germane to a finding of animus. <u>See id.</u> at 1285 n.32 ("Because <u>Windsor</u> involved an unusual federal intrusion into state domestic law (not at issue here) and <u>Romer</u> involved an unusual, total removal of any equal protection of the law (not at issue here), the Court proceeds to conduct a more traditional equal protection analysis by determining the proper level of scrutiny and then considering all conceivable justifications for Part A."); <u>id.</u> at 1288 ("The Court turns now to the conceivable justifications for Part A's preclusion of same-sex couples from receiving an Oklahoma marriage license[, including moral disapproval]."). As noted <u>supra</u>, the Supreme Court has understandably (indeed, wisely) never taken into account even more formal expressions of legislative will (i.e., recorded legislative history) when weighing the constitutionality of a popularly-enacted law, like the one before us, despite having had the opportunity to do so. It seems questionable, therefore, whether it would be appropriate for a court undertaking animus review in the context of such a law to ever consider the kind of materials cited by the district court here. At any rate, even assuming that such materials are cognizable in a case like this, the few and scattered quotes referenced by the district court, as well as by the plaintiffs and some of their amici, offer far too tenuous a basis to impugn the goodwill of the roughly one million Oklahomans who voted for SQ 711. <u>See id.</u> at 1259 n.1 (finding that SQ 711 was approved by a vote of 1,075,216 to 347,303).

-17-

the amendment); see also id. at 632 ("[T]he amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group . . . ."); id. at 633 ("Amendment 2 . . . identifies persons by a single trait and then denies them protection across the board."). SQ 711 cannot plausibly be painted with this brush. Unlike the amendment in Romer, SQ 711 does not deprive homosexuals of civil-rights "protection across the board," id. at 633, in a "[s]weeping and comprehensive" fashion, id. at 627. It excludes them from a single institution: marriage. For animus purposes, SQ 711 is an exclusion of a much different character than the Colorado amendment in Romer, which shut the door for homosexuals on myriad rights to which they might otherwise have gained access through the political process.

Furthermore, any fair historical narrative belies the theory that SQ 711 is "unprecedented in our jurisprudence." Id. at 633. Explicit bans on same-sex marriage are not especially venerable, but neither are they in their infancy. See Nancy Kubasek et al., Amending the Defense of Marriage Act: A Necessary Step Toward Gaining Full Legal Rights for Same-Sex Couples, 19 Am. U. J. Gender Soc. Pol'y & L. 959, 964 n.32 (2011) ("Maryland became the first state to define marriage as between a man and a woman in 1973 . . . .").

More to the point, SQ 711 and parallel enactments have only made explicit a tacit rule that until recently had been universal and unquestioned for the entirety of our legal history as a country: that same-sex unions cannot be sanctioned as

marriages by the State.  See Windsor, 133 S. Ct. at 2689 ("[M]arriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization.").  Even before the States made the rule explicit, marriage laws that lacked express gender limitations had the same force and effect as bans on same-sex marriage.  See Dean v. District of Columbia, 653 A.2d 307, 310 (D.C. 1995) (Ferren, J., concurring in part and dissenting in part, joined by Terry and Steadman, JJ.); Jones v. Hallahan, 501 S.W.2d 588, 589 (Ky. Ct. App. 1973); Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941, 953 (Mass. 2003); Baker v. Nelson, 191 N.W.2d 185, 186 (Minn. 1971); Hernandez v. Robles, 855 N.E.2d 1, 6 (N.Y. 2006) (plurality opinion); Baker v. State, 744 A.2d 864, 869 (Vt. 1999); see also Lewis v. Harris, 908 A.2d 196, 208 (N.J. 2006) ("With the exception of Massachusetts, every state's law, explicitly or implicitly, defines marriage to mean the union of a man and a woman." (emphases added)).  Far from being "unprecedented," then, Romer, 517 U.S. at 633, same-sex marriage bans were literally the only precedent in all fifty states until little more than a decade ago. See Michael Sant' Ambrogio, The Extra-Legislative Veto, 102 Geo. L.J. 351, 378 (2014) (noting that Massachusetts became the first state in the country to legally acknowledge same-sex marriages in 2003); see also David B. Oppenheimer et al., Religiosity and Same-Sex Marriage in the United States and Europe, 32 Berkeley J. Int'l L. 195, 195 (2014) ("Twenty years ago, no country in the world and not a

single US state had authorized same-sex marriage.").  Whether right or wrong as a policy matter, or even right or wrong as a fundamental-rights matter, this ancient lineage establishes beyond peradventure that same-sex marriage bans are not qualitatively unprecedented—they are actually as deeply rooted in precedent as any rule could be.[9]  See Hernandez, 855 N.E.2d at 8 ("Until a few decades ago, it

---

[9]     In an otherwise incisive opinion, the United States District Court for the Western District of Wisconsin recently analogized a same-sex marriage ban to the felled laws in Windsor and Romer, reasoning that the ban was likewise "unusual" in that it represented "a rare, if not unprecedented, act of using the [state] [c]onstitution to restrict constitutional rights rather than expand them." Walker, 2014 WL 2558444, at *33 (internal quotation marks omitted).  There are two problems with this argument.  First, it is misleading to suggest that a ban "restricts" a substantive constitutional right that had not been recognized beforehand.  Constitutional or otherwise, the plaintiffs' rights with respect to marriage—or lack thereof—were the same before the ban as after.  Second, even if it were correct to characterize the challenged laws as restrictions, they would not be restrictions of such a type as to qualify as "unusual" under Windsor and Romer.  DOMA was unusual because it represented an incursion by the federal government into a province historically dominated by the States.  See Windsor, 133 S. Ct. at 2691 (describing family law as "an area that has long been regarded as a virtually exclusive province of the States" (internal quotation marks omitted)); id. ("The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations . . . ."); id. ("[T]he states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . ." (alteration in original) (internal quotation marks omitted)).  Colorado's Amendment 2, at issue in Romer, was unusual because it cut off homosexuals' rights in an indiscriminate fashion across numerous legal fronts.  See 517 U.S. at 627 ("Sweeping and comprehensive is the change in legal status effected by this law."); id. at 632 (noting that Amendment 2 had "the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and . . . invalid form of legislation"); id. at 633 ("Amendment 2 . . . identifies persons by a single trait and then denies them protection across the board.").  SQ 711 is unusual in neither of these ways.  It is but one piece of Oklahoma's marriage regime, a regime our federalist system

(continued...)

-20-

was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted. We do not so conclude.").

A useful point of comparison in this regard can be located in the Ninth Circuit's Proposition 8 case, which nicely demonstrates the sort of qualitatively abnormal lawmaking that triggers the animus doctrine, and nicely demonstrates the absence of any such lawmaking here.

By way of background on the Proposition 8 case, prior to the pertinent federal litigation, California had codified a statute withholding "the official designation of marriage" from same-sex couples. Perry v. Brown, 671 F.3d 1052, 1065 (9th Cir. 2012), vacated on other grounds sub nom. Hollingsworth v. Perry, --- U.S. ----, 133 S. Ct. 2652 (2013). The California Supreme Court declared the statute unlawful as a violation of the state constitution. Id. at 1066. Following the court's decision, a referendum succeeded in adding an amendment—Proposition 8—to the California Constitution defining marriage in man-woman terms, thereby nullifying the judicial ruling. Id. at 1067.

The Ninth Circuit struck down Proposition 8 on federal constitutional

---

[9](...continued)
entrusts the States with maintaining, and it simply constitutionalizes a definition that Oklahoma has, since its creation, abided by.

-21-

grounds. Id. at 1096. It began its analysis by noting that "Proposition 8 worked a singular and limited change to the California Constitution: it stripped same-sex couples of the right to have their committed relationships recognized by the State with the designation of 'marriage,' which the state constitution had previously guaranteed them." Id. at 1076. In view of that effect, the Ninth Circuit posed the question presented by the appeal thusly:

> [D]id the People of California have legitimate reasons for enacting a constitutional amendment that serves only to take away from same-sex couples the right to have their lifelong relationships dignified by the official status of marriage, and to compel the State and its officials and all others authorized to perform marriage ceremonies to substitute the label of domestic partnership for their relationships?

Id. at 1079 (internal quotation marks omitted). The Ninth Circuit stressed the distinction between this removal of an established right and the decision not to confer a right at all. See id. at 1079–80 ("Withdrawing from a disfavored group the right to obtain a designation with significant societal consequences is different from declining to extend that designation in the first place . . . . The action of changing something suggests a more deliberate purpose than does the inaction of leaving it as is.").

With the question framed in this fashion, the Ninth Circuit determined that Proposition 8 failed constitutional scrutiny under Romer's animus analysis. See Perry, 671 F.3d at 1081. In reaching that determination, the Perry court returned time and time again to the fact that Proposition 8 had erased a previously-existing

-22-

right to marriage that had been enjoyed by same-sex couples before the ratification of the amendment.  See id. ("Like Amendment 2 [in Romer], Proposition 8 has the 'peculiar property' of 'withdraw[ing] from homosexuals, but no others,' an existing legal right—here, access to the official designation of 'marriage'—that had been broadly available . . . ." (second alteration in original) (emphases added) (citation omitted) (quoting Romer, 517 U.S. at 632)); id. ("Like Amendment 2, Proposition 8 . . . carves out an exception to California's equal protection clause, by removing equal access to marriage, which gays and lesbians had previously enjoyed . . . ." (emphasis added) (internal quotation marks omitted)); id. ("[T]he surgical precision with which [Proposition 8] excises a right belonging to gay and lesbian couples makes it even more suspect.  A law that has no practical effect except to strip one group of the right to use a state-authorized and socially meaningful designation is all the more 'unprecedented' and 'unusual' than a law that imposes broader changes, and raises an even stronger 'inference that the disadvantage imposed is born of animosity toward the class of persons affected.'" (emphases added) (quoting Romer, 517 U.S. at 633–34)); id. at 1096 ("By using their initiative power to target a minority group and withdraw a right that it possessed, without a legitimate reason for doing so, the People of California violated the Equal Protection Clause." (emphasis added)).

There is no need in the context of this case to pass upon the correctness vel non of the Ninth Circuit's ultimate conclusion—viz., that Proposition 8 was

-23-

unconstitutional under Romer.  The essential point to glean from Perry is that it properly recognized the key factor that brought Proposition 8 within the realm of Romer: that Proposition 8 removed from homosexuals a right they had previously enjoyed—marriage—just as Amendment 2 did in Romer with respect to the right to secure civil-rights protections through the political process.  See Romer, 517 U.S. at 632 ("[T]he amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and . . . invalid form of legislation.").  That is precisely the sort of atypical, hostile state action that exposes a law to animus analysis.  And it is precisely the sort of action that is nowhere to be seen in the case before us today.

Quite unlike the California situation, it is patent and undisputed that gay and lesbian couples in Oklahoma never had the right to marry—as such couples never had the right to marry in any State that did not expressly permit them to.  See Lewis, 908 A.2d at 208 ("With the exception of Massachusetts, every state's law, explicitly or implicitly, defines marriage to mean the union of a man and a woman." (emphases added)).  The Oklahoma law effectuated no change at all to the status quo in that regard: the plaintiffs could not marry in Oklahoma before SQ 711, and they could not marry after it.  A studious and conscientious reading of Romer seemingly led the Ninth Circuit in Perry to the conclusion that the deprivation of a right that would otherwise exist makes all the difference in deciding whether or not to invoke the strong medicine of the animus doctrine.  Cf.

-24-

Sevcik v. Sandoval, 911 F. Supp. 2d 996, 1019 (D. Nev. 2012) ("Because there has never been a right to same-sex marriage in Nevada, Romer and Perry are inapplicable here as to [a same-sex marriage ban]."). As noted, there was no pre-existing recognized right to same-sex marriage in Oklahoma. In other words, there was no predicate right to same-sex marriage to support the Perry deprivation scenario. Thus, my examination of Perry underscores the absence here of the sort of qualitatively abnormal lawmaking that customarily triggers the animus doctrine.

In sum, for the foregoing reasons, it is patent that Romer's animus analysis cannot support an assault on SQ 711.

**B**

Just like the first factor, the second factor—relating to the historical role of the lawmaking sovereign in regulating the field in question—also signals the inapplicability of the animus doctrine on these facts. As I discussed earlier, insofar as Windsor drew upon animus law, it did so because DOMA veered sharply from the deferential customs that had previously defined the contours of federal policy regarding State marriage regulations. See Part I.B.2, supra. In contrast, when the same-sex marriage provisions of a State are the subject of the challenge, those same federalism concerns found in Windsor militate powerfully in the opposite direction—viz., against an animus determination. To see why this is so, recall that in striking down the federal statute, DOMA, Windsor returned

-25-

repeatedly to the fact that state legislatures are entrusted in our federalist system with drawing the boundaries of domestic-relations law—so long as those boundaries are consistent with the mandates of the federal Constitution. See 133 S. Ct. at 2691 ("State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States." (citation omitted) (internal quotation marks omitted)); id. at 2692 ("Against this background DOMA rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next."). But, when the subject of the challenge is a State-enacted same-sex marriage ban, those federalism interests "come into play on the other side of the board." Id. at 2697 (Roberts, C.J., dissenting). Far from showing animus, then, Windsor's concern with traditional federalist spheres of power is a compelling indication that SQ 711—which is a natural product of the State of Oklahoma's sphere of regulatory concern—is not inspired by animus.

To summarize, the two factors that courts are duty-bound to consider in assaying for animus both counsel unequivocally here against an animus finding. Simply put, boiling these two factors down to their essence and applying them here, the challenged Oklahoma law does not sweep broadly—it excludes gays and

lesbians from the single institution of marriage—and it cannot sensibly be depicted as "unusual" where the State was simply exercising its age-old police power to define marriage in the way that it, along with every other State, always had.  See Conkle, supra, at 40 ("When the question turns from DOMA to state laws, . . . there are . . . reasons for avoiding animus-based reasoning.  In the first place, the state-law context eliminates the federalism concern that was present in Windsor and that the Court directly linked to its animus rationale.").

Romer and Windsor both involved extraordinarily unusual pieces of lawmaking: Romer because Colorado embedded in its constitution the deprivation of all specially designated civil-rights protections that an entire group might otherwise enjoy, and Windsor because Congress exercised federal power in a state arena for the sheer purpose of excluding a group from an institution that it otherwise had a virtually nonexistent role in defining.  In stark contrast, SQ 711 formalized a definition that every State had employed for almost all of American history, and it did so in a province the States had always dominated.  Consequently, SQ 711 is not plagued by impermissible animus.

## III

For the foregoing reasons, I conclude that the district court correctly found that the animus doctrine was inapplicable here.  I respectfully concur.

Nos. 14-5003 & 14-5006, Mary Bishop et al. v. Sally Howe Smith et al.

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

Plaintiffs made an unusual decision in this case.[1] They challenged only the constitutional amendment concerning same-gender marriage. Okla. Const. art. II, § 35. They ignored the earlier-enacted statutory provisions which define and only recognize marriage as between persons of opposite gender. Okla. Stat. tit. 43, §§ 3(A), 3.1. They also sued the wrong defendant when it comes to non-recognition of out-of-state same-gender marriages; the clerk has no occasion to pass on the validity of out-of-state marriages. The district court noticed both of these problems, yet entered an injunction concerning the constitutional amendment's definition of marriage. See Bishop v. United States ex rel. Holder, 962 F. Supp. 2d 1252, 1296 (N.D. Okla. 2014); Fed. R. Civ. P. 65(d)(1)(C) (requiring specificity in injunctions).

I concur with the court that the Barton couple lacks standing to challenge the non-recognition provision, but I differ on whether the "law of the case" applies. I dissent from this court's conclusion that the Plaintiffs have standing even though they did not challenge the underlying statutes. Thus, I would not reach the merits for lack of standing. As I have not persuaded my colleagues, were I to reach the merits of the Bishop couple's claim, I would dissent from this court's conclusion that Oklahoma's definition of marriage is invalid because marriage is a fundamental right and the State's classification

---

[1] See, e.g., Wolf v. Walker, No. 14-cv-64, 2014 WL 2558444, at *1, *43 (W.D. Wis. June 6, 2014) (challenging marriage amendment and statutes; injunction prohibits enforcement of both); Latta v. Otter, No. 1:13-cv-00482, 2014 WL 1909999, at *3, *29 (D. Idaho May 13, 2014) (same).

cannot survive strict scrutiny.   Instead, I would apply rational basis review and uphold Oklahoma's definition of marriage.

A.       Standing–Failure to Challenge the Underlying Statutes

Plaintiffs (Bishop couple) failed to challenge Oklahoma's statutory requirement concerning "Who may marry" which provides:

> Any unmarried person who is at least eighteen (18) years of age and not otherwise disqualified is capable of contracting and consenting to marriage with a person of the opposite sex.

Okla. Stat. tit. 43, § 3(A).  The district court was aware of the statutory prohibition and stated that no party addressed the "standing problems," but was satisfied that enjoining section A of the constitutional provision "redresses a concrete injury suffered by the Bishop couple."  Bishop, 962 F. Supp. 2d at 1259 n.2, 1274 n.19, 1279, 1296.

> Section A provides:

> Marriage in this state shall consist only of the union of one man and one woman.  Neither this Constitution nor any other provision of law shall be construed to require that marital status or the legal incidents thereof be conferred upon unmarried couples or groups.

Okla. Const. art. II, § 35(A).  Section C adds criminal liability for non-compliance.  Id. § 35(C).  No matter how important the issue, a federal court must consider standing, including whether the injury is likely to be redressed by a favorable decision. Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013).

Plaintiffs (Barton couple) failed to challenge Oklahoma's statutory non-

2

recognition requirement which provides:

> A marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage.

Okla. Stat. tit. 43, § 3.1. The constitutional non-recognition provision is the same. Okla. Const. art. II, § 35(B). The district court correctly observed that any injury from non-recognition comes from both of these provisions. Bishop, 962 F. Supp. 2d at 1266.

Enjoining section A of the constitutional amendment would not solve the Bishop couple's problem because the statute, Okla. Stat. tit. 43, § 3(A), contemplates "marriage with a person of the opposite sex." Enjoining section B of the constitutional amendment would not solve the Barton couple's problem because the statute, Okla. Stat. tit. 43, § 3.1, proscribes the same thing: recognition of same-gender marriages from other states.

According to this court, the statutory provisions are not enforceable independent of the constitutional provisions. But that cannot be right. In Oklahoma, marriage arises out of contract and requires consent by legally competent parties. Okla. Stat. tit. 43, § 1. Okla. Stat. tit. 43, § 3(A) imposes several requirements including being (1) unmarried, (2) at least age 18, and (3) not otherwise disqualified, for the capacity to contract and consent to opposite gender marriage. The constitutional provision defines marriage as one man and one woman and also provides a rule of construction for the constitution and "any other provision of law." Okla. Const. art. II, § 35(A). Although the non-recognition provisions have identical language, one would not presume that the electorate would engage in a useless act. If anything, the language in the constitutional provisions suggests

3

an intent to augment the statutory provisions, as was done in other states.  See Bishop,

962 F. Supp. 2d at 1283-84 (suggesting sentiment to create an independent bar); see also

supra n.1.  Indeed, that is the argument of the State.  Aplt. Br. 33.

The most serious problem with this court's analysis is that it is derived from cases

where provisions conflict; it would be an extravagant reading to conclude that Oklahoma

is not empowered to enact a consistent and clarifying constitutional provision without

replacing the statutory provision.  The rule stated in Fent v. Henry, 257 P.3d 984 (Okla.

2011), that a constitutional amendment "takes the place of all former laws existing upon

the subject with which it deals,"

> rests upon the principle that when it is apparent from the framework of the
> revision that whatever is embraced in the new law shall control and
> whatever is excluded is discarded, decisive evidence exists of an intention
> to prescribe the latest provisions as the only ones on that subject which shall
> be obligatory.

Id. at 992 n.20.  We have no such "decisive evidence" in this case because there is no

"framework of revision" when the constitutional amendment in no way contradicts the

statutes.  Although this court contends that the constitutional amendment is "a complete

scheme," Lankford v. Menefee, 145 P. 375, 376 (Okla. 1914), concerning same-gender

marriage, the amendment certainly does not replace the other marriage qualifications

contained in Okla. Stat. tit. 43, § 3(A).  Nor should it replace the qualification "with a

person of the opposite sex."  Of course, the most important canon of construction must be

fidelity to the intent of the electorate and its representatives: a canon that is not well-

served by disregarding Oklahoma's statutes and focusing only on the amendment.  This

4

court's argument that it can envision no scenario where the clerk could enforce the statute but not the amendment fails to appreciate the independent and complementary nature of the provisions.

Invalidating state law provisions as violative of the Constitution is one of the most serious tasks performed by a federal court. Though the Plaintiffs apparently thought otherwise, state statutes do matter. Plaintiffs, who have the burden on standing, Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), cannot show redressability.

B. Law of the Case

The district court was correct in concluding that the Barton couple lacks standing to challenge the non-recognition constitutional provision. See Bishop, 962 F. Supp. 2d at 1272-73. This court concludes that the law of the case doctrine extended to this challenge, and the court clerk would have been the proper defendant but for changed circumstances, i.e., the affidavit of the court clerk. The law of the case doctrine does not apply. The court clerk's duties are ministerial, and she has no authority to recognize out-of-state marriages. See Okla. Stat. tit. 43, § 5(B)(1) (listing the duties of the clerk). The Barton couple concede that they never asked the court clerk to recognize their California license.

The law of the case doctrine is one of discretion, not power, and applies only to issues actually decided. Pepper v. United States, 131 S. Ct. 1229, 1250-51 (2011). The issue actually decided in the prior appeal of this case, Bishop I, was that the Attorney

5

General and the Governor were not proper defendants. <u>Bishop v. Oklahoma</u>, 333 F.

App'x 361, 365 (10th Cir. 2009). We stated:

> The Couples claim they desire to be married but are prevented from doing so, or they are married but the marriage is not recognized in Oklahoma. These claims are simply not connected to the duties of the Attorney General or the Governor. Marriage licenses are issued, fees collected, and the licenses recorded by the district court clerks. <u>See</u> Okla. Stat. tit. 28, § 31; Okla. Stat. tit. 43, § 5. "[A] district court clerk is 'judicial personnel' and is an arm of the court whose duties are ministerial, except for those discretionary duties provided by statute. In the performance of [a] clerk's ministerial functions, the court clerk is subject to the control of the Supreme Court and the supervisory control that it has passed down to the Administrative District Judge in the clerk's administrative district." <u>Speight v. Presley</u>, 203 P.3d 173, 177 (Okla. 2008). Because recognition of marriages is within the administration of the judiciary, the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage.

<u>Id.</u> at 365 (alterations in original). We stressed that the problem was "the alleged injury

to the Couples could not be caused by any action of the Oklahoma officials" named. <u>Id.</u>

In noting that Plaintiffs never sought an injunction, we stressed that the Plaintiffs never

identified "any action" that would be taken by those officials, that they "act or refrain

from acting." <u>Id.</u> at 365 n.6.

Merely because we described the Plaintiffs' two claims at the beginning of the

passage cannot alter the import of what follows. No reasonable reading results in a

conclusion that the court clerk was a proper defendant for a challenge to the amendment's

non-recognition provision. The only functions mentioned are issuance of a license,

collection of fees, and recording a license. As stated by the district court: "The Bishop

couple has proven standing because they sought an Oklahoma marriage license from

6

Smith, Smith denied them such license, and Smith did so based upon their status as a same-sex couple. Unlike with Part B, the Bishop couple has clearly demonstrated Smith's connection to their injury." Bishop, 962 F. Supp. 2d at 1274. Here, the Barton couple had the burden to show that the court clerk had some authority over the non-recognition provision and that their injuries are fairly traceable to her. Cressman v. Thompson, 719 F.3d 1139, 1145-46 (10th Cir. 2013); Bronson v. Swensen, 500 F.3d 1099, 1109-10 (10th Cir. 2007).

Nothing in Bishop I remotely suggested that the court clerk was the proper defendant for any challenge. To the contrary, the panel discussed the clerk's authority and that "recognition of marriages is within the administration of the judiciary." Bishop, 333 F. App'x at 365. Moreover, the panel in Bishop I relied heavily on Bronson. Bronson stressed that a plaintiff must establish that *this* defendant caused the injury, and an injunction against *this* defendant would provide relief. 500 F.3d at 1111-12. Merely because the clerk is considered judicial personnel and has ministerial power over some aspects of marriage cannot change the fact that she has no power to recognize out-of-state marriages. The district court's analysis is consistent with the care this court has taken in the past with standing. See Cressman, 719 F.3d at 1145-47; Bronson, 500 F.3d at 1111-12. The standing problem is of the Barton couple's own making: as this court notes, Plaintiffs could very easily have sought to file a state tax return and then sued the responsible official were they not allowed.

In summary, I would hold that the Barton and Bishop couples lack standing

7

because they failed to challenge Oklahoma's statutes which must be respected as an independent bar to relief. I agree with the court that the Barton couple lacks standing because they sued the wrong defendant—one with no power to recognize their out-of-state marriage. As I have not persuaded my colleagues on the definition of marriage claim, I proceed to its merits.

C.    Merits

I adhere to my views in Kitchen v. Herbert, ___F.3d___, ____ , 2014 WL 2868044, at *33 (10th Cir. June 25, 2014) (Kelly, J., concurring in part and dissenting in part). Same-gender marriage is a public policy choice for the states, and should not be driven by a uniform, judge-made fundamental rights analysis. At a time when vigorous public debate is defining policies concerning sexual orientation, this court has intervened with a view of marriage ostensibly driven by the Constitution. Unfortunately, this approach short-circuits the healthy political processes leading to a rough consensus on matters of sexual autonomy, and marginalizes those of good faith who draw the line short of same-gender marriage.

Essentially, relying upon substantive due process, this court has "deduced [a right] from abstract concepts of personal autonomy" rather than anchoring it to this country's history and legal traditions concerning marriage. See Washington v. Glucksberg, 521 U.S. 702, 725 (1997). When it comes to deciding whether a state has violated a fundamental right to marriage, the substantive due process analysis must consider the

8

history, legal tradition, and practice of the institution.  Id. at 721.  Although Plaintiffs remind us history and tradition are not necessarily determinative, Aplee. Br. 65, Oklahoma's efforts to retain its definition of marriage are benign, and very much unlike race-based restrictions on marriage invalidated in Loving v. Virginia, 388 U.S. 1 (1967).

This court's fundamental rights analysis turns largely on certain "personal aspects" of marriage including the "emotional support and public commitment" inherent in the historically accepted definition of marriage.  Kitchen, 2014 WL 2868044, at *14-15 (relying on Turner v. Safley. 482 U.S. 78, 95-96 (1987)).  But analyzing marriage primarily as the public recognition of an emotional union is an ahistorical understanding of marriage.  Western marriage has historically included elements besides emotional support and public commitment, including (1) exclusivity, (2) monogamy, (3) non-familial pairs, and (4) gender complementarity, distinct from procreation.  Not surprisingly, this historical understanding and practice is the basis for much of state law.  The core marital norms throughout Oklahoma's history have included these elements.  See Okla. Stat. tit. 43, § 201 (obligation of fidelity); Okla. Const. art. I, § 2 (prohibiting polygamy); Okla. Stat. tit. 43, § 3(C) (prohibiting incestuous marriage); Okla. Const. art. II, § 35(A) (defining marriage as "the union of one man and one woman"); Okla. Stat. tit. 43, § 3(A) (marriage qualifications for opposite-gender marriage).

Plaintiffs essentially argue that the scope of the right is unlimited.  Aplee. Br. 65.  In Kitchen, this court accepted a similar argument: that the definition of marriage cannot be determined by who has historically been denied access to the right.  See Kitchen, 2014

9

WL 2868044 at \*18. But the definition of marriage plays an important role in determining what relationships are recognized in the first place. Polygamous and incestuous relationships have not qualified for marriage because they do not satisfy the elements of monogamy and non-familial pairs, regardless of the individual status of the parties (who have historically been denied access to the right). Thus, the traditional elements of marriage have determined the relationships that have been recognized, not the other way around.

This court shortchanges the analysis of whether the fundamental right to marriage includes same-gender couples by asserting, "[o]ne might just as easily have argued that interracial couples are by definition excluded from the institution of marriage." Id. at \*19; accord Aplee. Br. 66. But, as far as I can tell, no one in Loving v. Virginia, 388 U.S. 1 (1967), could have argued that racial homogeneity was an essential element of marriage. Here, the limitation on marriage is derived from the fundamental elements of marriage, elements not implicated in invalidating marriage restrictions on inmates (Turner v. Safley, 482 U.S. 78 (1987)) or fathers with support obligations (Zablocki v. Redhail, 434 U.S. 374 (1978)).

Simply put, none of the Supreme Court cases suggest a definition of marriage so at odds with historical understanding. The Court has been vigilant in striking down impermissible constraints on the right to marriage, but there is nothing in the earlier cases suggesting that marriage has historically been defined as only an emotional union among willing adults. Removing gender complementarity from the historical definition of

10

marriage is simply contrary to the careful analysis prescribed by the Supreme Court when

it comes to substantive due process. Absent a fundamental right, traditional rational basis

equal protection principles should apply, and apparently as a majority of this panel

believes,[2] the Plaintiffs cannot prevail on that basis. Thus, any change in the definition of

marriage rightly belongs to the people of Oklahoma, not a federal court.

---

[2] Though this court disclaims an opinion, Judge Holmes' concurrence strongly suggests that the amendment would survive rational basis review. According to the concurrence, Oklahoma's amendment (1) is limited to a single institution: marriage, (2) is supported by history, legal precedent, and statutory enactments dating back to 1973, (3) does not divest anyone of a pre-existing right, (4) should be viewed as the product of the goodwill of one million Oklahomans, and (5) is consistent with the State's police power, unlike the federal intrusion into marriage at issue in United States v. Windsor, 133 S. Ct. 2675 (2013).

APPENDIX A

27 SCHOLARS OF FEDERALISM AND JUDICIAL RESTRAINT

*Attorneys on the Brief:* Anthony T. Caso, John C. Eastman, D. John Sauer

46 EMPLOYERS AND ORGANIZATIONS REPRESENTING EMPLOYERS

*Attorneys on the Brief:* Meghan Bailey, Susan Baker Manning, John V. McDermott, Lauren Schmidt, Margaret Sheer, Michael Louis Whitlock

57 OTHER FAMILY LAW PROFESSORS

*Attorneys on the Brief:* Rita F. Lin, Laura W. Weissbein

93 INDIVIDUAL FAITH LEADERS IN OKLAHOMA AND UTAH

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

9TO5, NATIONAL ASSOCIATION OF WORKING WOMEN

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ACLU OF OKLAHOMA

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ACLU OF UTAH

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

AFFIRMATION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

ALDRICH, JOHN

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

ALL SOULS UNITARIAN CHURCH OF TULSA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

ALLEN, DOUGLAS W.

*Attorneys on the Brief:* David C. Walker

ALVARE, HELEN M.

*Attorneys on the Brief:* Richard D. White

AMBROSE, DOUGLAS

*Attorneys on the Brief:* Frank D. Mylar

AMERICAN CIVIL LIBERTIES UNION

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiessel, John M. Mejia

AMERICAN LEADERSHIP FUND

*Attorneys on the Brief:* Frank D. Mylar

AMERICAN MILITARY PARTNER ASSOCIATION

*Attorneys on the Brief:* Abbe David Lowell, Christopher Dowden Man

AMERICAN PSYCHOLOGICAL ASSOCIATION

*Attorneys on the Brief:* Nathalie F.P. Gilfoyle, Paul March Smith

AMERICAN SOCIOLOGICAL ASSOCIATION

*Attorneys on the Brief:* Carmine D. Boccuzzi, Mark A. Lightner, Andrew P. Meiser, Andra Troy

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

ANDERSON, JANNA

*Attorneys on the Brief:* Dani Hartvigsen

ANDERSON, RYAN

*Attorneys on the Brief:* Michael Francis Smith

ANTI-DEFAMATION LEAGUE

*Attorneys on the Brief:* Cheryl R. Drazin, Steven M. Freeman, Seth M. Marnin, Rocky Chiu-feng Tsai

API EQUALITY-LA

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ASIAN AMERICANS ADVANCING JUSTICE, ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ASIAN AMERICANS ADVANCING JUSTICE, LOS ANGELES

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ASIAN AMERICANS ADVANCING JUSTICE-CHICAGO

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

AUSTIN LGBT BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

BAR ASSOCIATION OF SAN FRANCISCO

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

BARDAGLIO, PETER

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

BASCH, NORMA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

BECKET FUND FOR RELIGIOUS LIBERTY

*Attorneys on the Brief:* Eric C. Rassbach, Asma Tasnim Uddin

BELTRAN, LYNN

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Robert A. Kaplan, Joshua Kaye, Alan B. Morrison

BELZ, HERMAN

*Attorneys on the Brief:* Frank D. Mylar

BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

BENNE, ROBERT D.

*Attorneys on the Brief:* Frank D. Mylar

BLAIR, MARIANNE

*Attorneys on the Brief:* Rita F. Lin, Laura W. Weissbein

BOWLER, SHAUN

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

BOYLE, DAVID

*Attorneys on the Brief:* David Boyle

CAIN, BRUCE

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

CALIFORNIA

*Attorneys on the Brief:* Kamala D. Harris, Peter Sacks

CAMP FIRE GREEN COUNTRY, INC.

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

CARBADO, DEVON

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

CARLSON, ALLAN C.

*Attorneys on the Brief:* Frank D. Mylar

CARROLL, JASON S.

*Attorneys on the Brief:* Lynn Dennis Wardle

CATHEDRAL OF HOPE OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CATO INSTITUTE

*Attorneys on the Brief:* Ilya Shapiro, Elizabeth B. Wydra

CENTER FOR CONSTITUTIONAL JURISPRUDENCE

*Attorneys on the Brief:* Anthony T. Caso, John C. Eastman, D. John Sauer

CENTRAL CONFERENCE OF AMERICAN RABBIS

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

CHRISTENSEN, LAVAR

*Attorneys on the Brief:* Robert Theron Smith

CHURCH OF THE OPEN ARMS OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CHURCH OF THE RESTORATION OF TULSA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CIMARRON ALLIANCE

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

CLAYTON, CORNELL W.

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

COLAGE

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

COLORADO GAY LESBIAN BISEXUAL TRANSGENDER (GLBT) BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

COLORADO WOMEN'S BAR ASSOCIATION

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

CONGREGATION KOLAMI OF SALT LAKE CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CONNECTICUT

*Attorneys on the Brief:* George Jepsen, Peter Sacks

CONSTITUTIONAL ACCOUNTABILITY CENTER

*Attorneys on the Brief:* Shapiro Ilya, Elizabeth B. Wydra

CONSTITUTIONAL LAW SCHOLARS

*Attorneys on the Brief:* Lori Ann Alvino McGill, Geoffrey R. Stone

COONTZ, STEPHANIE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

COTT, NANCY

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

COVENANT NETWORK OF PRESBYTERIANS

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

COX, DUANE MORLEY

*Attorneys on the Brief:* Duane Morley Cox

CURTIS, G.M.

*Attorneys on the Brief:* Frank D. Mylar

DELAWARE

*Attorneys on the Brief:* Joseph R. Biden III, Peter Sacks

DISTRICT OF COLUMBIA

*Attorneys on the Brief:* Irvin B. Nathan, Peter Sacks

DITZ, TOBY L.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

DOLOVICH, SHARON

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

DUBLER, ARIELA R.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

EDWARDS, LAURA F.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

EGGEBEEN, DAVID J.

*Attorneys on the Brief:* David C. Walker

EMERGENCY INFANT SERVICES

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

EMERSON, MICHAEL O.

*Attorneys on the Brief:* Frank D. Mylar

EPISCOPAL DIOCESE OF UTAH

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

EPWORTH UNITED METHODIST CHURCH OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

EQUAL RIGHTS ADVOCATES

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

EQUALITY UTAH

*Attorneys on the Brief:* Troy L. Booher, Clifford J. Rosky, Noella A. Sudbury, Michael D. Zimmerman

FAMILY EQUALITY COUNCIL

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

FAMILY RESEARCH COUNCIL

*Attorneys on the Brief:* Paul Benjamin Linton

FELLOWSHIP CONGREGATIONAL UNITED CHURCH OF CHRIST OF TULSA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

FIRST UNITARIAN CHURCH OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

FLUKE, CHARLES

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Robert A. Kaplan, Joshua Kaye, Alan B. Morrison

FREEDOM TO MARRY

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

FRIENDS FOR LESBIAN, GAY, BISEXUAL, TRANSGENDER, AND QUEER CONCERNS

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

GAY & LESBIAN ADVOCATES & DEFENDERS

*Attorneys on the Brief:* Felicia H. Ellsworth, Mark C. Fleming, Leah M. Litman, Dina Bernick Mishra, Kenneth Lee Salazar, Alan E. Schoenfeld, Paul Reinherz Wolfson

GEORGE, ROBERT P.

*Attorneys on the Brief:* Michael Francis Smith

GEORGE, TIMOTHY

*Attorneys on the Brief:* Frank D. Mylar

GIRGIS, SHERIF

*Attorneys on the Brief:* Michael Francis Smith

GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY

*Attorneys on the Brief:* Nicholas M. O'Donnell

GROSSBERG, MICHAEL

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

HAIDER-MARKEL, DONALD P.

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

HARTOG, HENDRIK

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HAWKINS, ALAN J.

*Attorneys on the Brief:* Lynn Dennis Wardle

HAYASHI, SCOTT

> *Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

HERMAN, ELLEN

> *Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HERO, RODNEY

> *Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

HINDU AMERICAN FOUNDATION

> *Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

HISPANIC NATIONAL BAR ASSOCIATION

> *Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

HISTORIANS OF ANTIGAY DISCRIMINATION

> *Attorneys on the Brief:* Katie D. Fairchild, Madeline H. Gitomer, Jessica Black Livingston, Katherine A. Nelson, Aaron M. Paul, Erica Knievel Songer, Catherine Emily Stetson, Mary Helen Wimberly

HODES, MARTHA

> *Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HOLLINGER, JOAN HEIFETZ

> *Attorneys on the Brief:* Rita F. Lin, Laura W. Weissbein

HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC

> *Attorneys on the Brief:* David Scott Flugman

HUMAN RIGHTS CAMPAIGN

> *Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

HUNTER, NAN D.

> *Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

ILLINOIS

> *Attorneys on the Brief:* Lisa Madigan, Peter Sacks

INTERFAITH ALLIANCE FOUNDATION

> *Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

INTERFAITH ALLIANCE OF COLORADO

> *Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

IOWA

> *Attorneys on the Brief:* Tom Miller, Peter Sacks

JAMES, HAROLD

> *Attorneys on the Brief:* Frank D. Mylar

JAPANESE AMERICAN CITIZENS LEAGUE

> *Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

JEWISH SOCIAL POLICY ACTION NETWORK

> *Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

JOHNSON, BYRON R.

> *Attorneys on the Brief:* David C. Walker

JOSLIN, COURTNEY

> *Attorneys on the Brief:* Rita F. Lin, Laura W. Weissbein

JUSTICE, STEVEN

> *Attorneys on the Brief:* Frank D. Mylar

KERBER, LINDA K.

> *Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

KESHET

> *Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

KESSLER-HARRIS, ALICE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

KOONS, ROBERT C.

*Attorneys on the Brief:* Frank D. Mylar

KURTZ, STANLEY

*Attorneys on the Brief:* Frank D. Mylar

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.

*Attorneys on the Brief:* Jennifer C. Pizer, Susan Sommer, Camilla Taylor, Kenneth D. Upton

LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

LEE, TAEKU

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

LEGAL MOMENTUM

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

LEGAL VOICE

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

LEVI, MARGARET

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

LEWIS, GREGORY B.

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

LGBT & ALLIED LAWYERS OF UTAH BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

LIBERTY COUNSEL, INC.

*Attorneys on the Brief:* Anita Staver, Mathew D. Staver

LITTLETON, CHRISTINE A.

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

LOVE HONOR CHERISH

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

LUTHERAN CHURCH-MISSOURI SYNOD

*Attorneys on the Brief:* Anthony T. Caso, Alexander Dushku, Richard Shawn Gunnarson, Justin W. Starr

MAINE

*Attorneys on the Brief:* Janet T. Mills, Peter Sacks

MARRIAGE EQUALITY USA

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

MARTINEZ-EBERS, VALERIE

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

MARYLAND

*Attorneys on the Brief:* Douglas F. Gansler, Peter Sacks

MASSACHUSETTS

*Attorneys on the Brief:* Martha Coakley, Michelle L. Leung, Jonathan B. Miller, Genevieve C. Nadeau, Peter Sacks

MAY, ELAINE TYLER

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

MAYERI, SERENA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

MAYFLOWER CONGREGATIONAL UNITED CHURCH OF CHRIST OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

MCCANN, MICHAEL

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

MCDERMOTT, GERALD R.

*Attorneys on the Brief:* Frank D. Mylar

MCHUGH, PAUL

*Attorneys on the Brief:* Gerard Vincent Bradley, Kevin Trent Snider

MCIFF, KAY

*Attorneys on the Brief:* Robert Theron Smith

METHODIST FEDERATION FOR SOCIAL ACTION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

METROPOLITAN COMMUNITY CHURCHES

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

MINNESOTA LAVENDER BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

MINTZ, STEVE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

MOORE, RUSSELL

*Attorneys on the Brief:* Frank D. Mylar

MORE LIGHT PRESBYTERIANS

*Attorneys on the Brief:* Samual P Bickett, Kurt M. Denk, Rebecca Harlow, Idin Kashefipour, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

MORMONS FOR EQUALITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

MT. TABOR LUTHERAN CHURCH OF SALT LAKE CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

NAACP SALT LAKE BRANCH & NAACP TRI STATE CONFERENCE OF IDAHO, NEVADA AND UTAH

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

NATIONAL ACTION NETWORK

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY

*Attorneys on the Brief:* Stephen M. Crampton, Mary Elizabeth McAlister

NATIONAL ASSOCIATION OF EVANGELICALS

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

NATIONAL ASSOCIATION OF WOMEN LAWYERS

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

NATIONAL COUNCIL OF JEWISH WOMEN

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

NATIONAL COUNCIL OF LA RAZA

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL GAY AND LESBIAN TASK FORCE

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL ORGANIZATION FOR WOMEN FOUNDATION

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

NATIONAL WOMEN'S LAW CENTER

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

NEHIRIM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

NELSON, MERRILL

*Attorneys on the Brief:* Robert Theron Smith

NERO, NICHOLAS

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Robert A. Kaplan, Joshua Kaye, Alan B. Morrison

NEW HAMPSHIRE

*Attorneys on the Brief:* Joseph A. Foster, Peter Sacks

NEW MEXICO

*Attorneys on the Brief:* Gary K. King, Peter Sacks

NEW MEXICO LESBIAN AND GAY LAWYERS ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

NEW YORK

*Attorneys on the Brief:* Peter Sacks, Eric T. Schneiderman

O'GRADY, CLAUDIA

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Robert A. Kaplan, Joshua Kaye, Alan B. Morrison

OKLAHOMA CITY UNIVERSITY SCHOOL OF LAW OUTLAWS

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

OKLAHOMANS FOR EQUALITY

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

OREGON

*Attorneys on the Brief:* Ellen F. Rosenblum, Peter Sacks

OUTSERVE-SLDN

*Attorneys on the Brief:* Abbe David Lowell, Christopher Dowden Man

PAKALUK, CATHERINE R.

*Attorneys on the Brief:* David C. Walker

PAQUETTE, ROBERT

*Attorneys on the Brief:* Frank D. Mylar

PARENTS, FAMILIES AND FRIENDS OF LESBIANS AND GAYS, INC.

*Attorneys on the Brief:* Andrew John Davis, Jiyun Cameron Lee

PEOPLE FOR THE AMERICAN WAY FOUNDATION

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

PLECK, ELIZABETH

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

POLIKOFF, NANCY

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

PRESBYTERIAN WELCOME

*Attorneys on the Brief:* Samual P Bickett, Kurt M. Denk, Rebecca Harlow, Idin Kashefipour, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

PRICE, JOSEPH

*Attorneys on the Brief:* David C. Walker

PUBLIC ADVOCATES, INC.

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

QLAW - THE GLBT BAR ASSOCIATION OF WASHINGTON

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

RAHE, PAUL A.

*Attorneys on the Brief:* Frank D. Mylar

RECONCILING MINISTRIES NETWORK

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION

*Attorneys on the Brief:* Samual P Bickett, Kurt M. Denk, Rebecca Harlow, Idin Kashefipour, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

RECONSTRUCTIONIST RABBINICAL ASSOCIATION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

RECONSTRUCTIONIST RABBINICAL COLLEGE

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

REGNERUS, MARK D.

*Attorneys on the Brief:* David C. Walker

RELIGIOUS INSTITUTE, INC.

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

REYNOLDS, MICHAEL A.

*Attorneys on the Brief:* Frank D. Mylar

RHODE ISLAND

*Attorneys on the Brief:* Peter F. Kilmartin, Peter Sacks

ROVIG, STANFORD

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Robert A. Kaplan, Joshua Kaye, Alan B. Morrison

SCHULTZ, VICKI

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

SEARS, BRAD

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

SEGURA, GARY

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

SHAMMAS, CAROLE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

SHANLEY, MARY

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

SHERRILL, KENNETH

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

SHIFFRIN, SEANA

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

SIKH AMERICAN LEGAL DEFENSE AND EDUCATION FUND

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

SMITH, CHARLES ANTHONY

*Attorneys on the Brief:* Mark William Mosier, Jennifer Schwartz

SNOW, LOWRY

*Attorneys on the Brief:* Robert Theron Smith

SOCIETY FOR HUMANISTIC JUDAISM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

SOUTH ASIAN AMERICANS LEADING TOGETHER

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

SOUTHWEST WOMEN'S LAW CENTER

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

ST. STEPHEN'S UNITED METHODIST CHURCH OF NORMAN, OKLAHOMA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

STANLEY, AMY DRU

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

STATE OF ALABAMA

*Attorneys on the Brief:* Thomas Molnar Fisher, Luther Strange

STATE OF ALASKA

*Attorneys on the Brief:* Thomas Molnar Fisher, Michael C. Geraghty

STATE OF ARIZONA

*Attorneys on the Brief:* Thomas Molnar Fisher, Thomas C. Horne

STATE OF COLORADO

*Attorneys on the Brief:* Thomas Molnar Fisher, John Suthers

STATE OF IDAHO

*Attorneys on the Brief:* Thomas Molnar Fisher, Lawrence G. Wasden

STATE OF INDIANA

*Attorneys on the Brief:* Thomas Molnar Fisher, Gregory F. Zoeller

STATE OF KANSAS

*Attorneys on the Brief:* Jeffrey A. Chanay, Bryan Charles Clark

STATE OF MICHIGAN

*Attorneys on the Brief:* Aaron Lindstrom, Bernard Eric Restuccia, Bill Schuette

STATE OF MONTANA

*Attorneys on the Brief:* Thomas Molnar Fisher, Timothy C. Fox

STATE OF NEBRASKA

*Attorneys on the Brief:* Jon Bruning, Thomas Molnar Fisher

STATE OF OKLAHOMA

*Attorneys on the Brief:* Thomas Molnar Fisher, E. Scott Pruitt

STATE OF SOUTH CAROLINA

*Attorneys on the Brief:* Thomas Molnar Fisher, Alan Wilson

STONEWALL BAR ASSOCIATION OF GEORGIA, INC.

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

STONEWALL BAR ASSOCIATION OF MICHIGAN

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

STONEWALL LAW ASSOCIATION OF GREATER HOUSTON

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

STRAUB, D'ARCY WINSTON

*Attorneys on the Brief:* D'Arcy Winston Straub

THE CENTER FOR URBAN RENEWAL AND EDUCATION

*Attorneys on the Brief:* Stephen Kent Ehat

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

THE COALITION OF AFRICAN-AMERICAN PASTORS USA

*Attorneys on the Brief:* Stephen Kent Ehat

THE EQUALITY NETWORK

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

THE ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

THE FREDERICK DOUGLASS FOUNDATION, INC.

*Attorneys on the Brief:* Stephen Kent Ehat

THE OUTLAWS

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

THE UTAH PSYCHOLOGICAL ASSOCIATION

*Attorneys on the Brief:* Nathalie F.P. Gilfoyle, Paul March Smith

TRINITY CHRISTIAN CHURCH OF EDMOND, OKLAHOMA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

UNION FOR REFORM JUDAISM

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITARIAN UNIVERSALIST ASSOCIATION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITED CHURCH OF CHRIST

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITED CHURCH OF NORMAN, OKLAHOMA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

UNIVERSITY OF OKLAHOMA COLLEGE OF LAW LEGAL GROUP FOR BUILDING TOLERANCE AND ACCEPTANCE

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

UPHAM, DAVID R.

*Attorneys on the Brief:* David Robert Upham

UTAH PRIDE CENTER

*Attorneys on the Brief:* Clifford J. Rosky, Noella A. Sudbury, Michael D. Zimmerman

VERMONT

*Attorneys on the Brief:* Peter Sacks, William H. Sorrell

WASHINGTON

*Attorneys on the Brief:* Robert W. Ferguson, Peter Sacks

WELKE, BARBARA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

WESTERN REPUBLICANS

*Attorneys on the Brief:* Stacy A. Carpenter, Bennett L. Cohen, Jon R. Dedon, Sean Robert Gallagher

WILKEN, ROBERT LOUIS

*Attorneys on the Brief:* Frank D. Mylar

WINKLER, ADAM

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

WOLFE, CHRISTOPHER

*Attorneys on the Brief:* Frank D. Mylar

WOMEN OF REFORM JUDAISM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

WOMEN'S LAW PROJECT

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

WOMEN'S LEAGUE FOR CONSERVATIVE JUDAISM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

WOOD, PETER W.

*Attorneys on the Brief:* Frank D. Mylar

WORTHAM, DOUGLAS

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Robert A. Kaplan, Joshua Kaye, Alan B. Morrison